## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATES of CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; FLORIDA; GEORGIA; HAWAII; ILLINOIS; INDIANA; IOWA; LOUISIANA; MARYLAND; COMMONWEALTH OF MASSACHUSETTS; MICHIGAN; MINNESOTA; MONTANA; NEVADA; NEW HAMPSHIRE; NEW JERSEY; NEW MEXICO; NEW YORK; NORTH CAROLINA; OKLAHOMA; RHODE ISLAND; TENNESSEE; TEXAS; VERMONT; COMMONWEALTH OF VIRGINIA; WASHINGTON; the DISTRICT OF COLUMBIA; and the CITIES OF NEW YORK; CHICAGO AND PHILADELPHIA; ALLEGHENY COUNTY, PENNSYLVANIA, *ex rel.* STAN ELLIS,<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION (FORMERLY KNOWN AS CVS CAREMARK CORPORATION); ADVANCED CARE SCRIPTS, INC.; CAREMARK, LLC (F/K/A CAREMARK, INC.); CAREMARK PUERTO RICO SPECIALTY PHARMACY, LLC; PROCARE PHARMACY, LLC; and PROCARE PHARMACY DIRECT, LLC,<br><br>Defendants. | Case No. 2:16-cv-01582-GAM<br><br>JURY TRIAL DEMANDED |

## AMENDED QUI TAM COMPLAINT

Plaintiff-Relator Stan Ellis, by and through his undersigned attorneys, on behalf of

the United States of America (the "United States") and the State of California, the State of

Colorado, the State of Connecticut, the State of Delaware, the State of  Florida,  the State

of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma; the State of Rhode Island; the State of Tennessee, the State of Texas, the State of Vermont, the Commonwealth of Virginia, the State of Washington, and the District of Columbia (collectively "Plaintiff States"), the City of New York, the City of Chicago, the City of Philadelphia, and Allegheny County, Pennsylvania (the "municipalities") for his Amended Complaint against Defendant CVS Health Corporation (formerly known as CVS Caremark Corporation), and its subsidiaries Advanced Care Scripts, Inc.; Caremark, LLC (f/k/a Caremark, Inc.); Caremark Puerto Rico Specialty Pharmacy, LLC; ProCare Pharmacy, LLC; and ProCare Pharmacy Direct, LLC (collectively referred to herein as "Defendants"), alleges based upon personal knowledge and relevant documents, as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and the Plaintiff States and municipalities arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 *et seq.*, as amended ("the FCA" or "the Act") and its state-law counterparts, the California False Claims Act, (Cal. Gov't Code §§ 12650-12655); the Colorado Medicaid False Claims Act, (Col. Rev. Stat. § 25.5-1-104 *et seq.*); the Connecticut False Claims Act, Chapter 319v, Sec. 17b-301 *et seq.*; the Delaware False Claims and Reporting Act (6 Del. C. § 1201 *et seq.*); the Florida False

Claims Act (Fla. Stat. § 68.081 *et seq.*); the Georgia Medicaid False Claims Act (O.C.G.A. § 49-4-169 *et seq.*); the Hawaii False Claims Act (H.R.S § 661-21 and H.R.S. 46-171 *et seq.*); the Illinois Whistleblower and Reward Protection Act (740 I.L.C.S. § 175/1 *et seq.*); the Indiana False Claims Act (Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*); the Iowa Medicaid False Claims Act, §685.1 *et seq.;* the Louisiana Medical Assistance Programs Integrity Law (La. R.S. § 46:437.2 *et seq.*); the Maryland False Claims Act, the Maryland False Health Claims Act of 2010 (Subtitle 6, False Claims Against State Health Plans and State Health Programs, § 2-601 *et seq.*); the Massachusetts False Claims Act (M.G.L.A. 12 § 5b *et seq.*); the Michigan Medicaid False Claims Act (M.C.L. § 400.607 *et seq.*); the Minnesota False Claims Act (Minn. Stat. § 15C.01 *et seq.*); the Montana False Claims Act (Mont. Code Ann. § 17-8-401 *et seq.*); the Nevada False Claims Act (N.R.S. § 357.010 *et seq.*); the New Jersey False Claims Act (New Jersey Statutes 2A:32C-1 *et seq.*); the New Mexico Fraud Against Taxpayers Act (N.M. Stat. Ann. § 44-9-1); the New York False Claims Act (N.Y. C.L.S. St. Fin. § 187 *et seq.*); the North Carolina False Claims Act, N.C. Gen. Stat §§1-605 *et seq.*, the Oklahoma Medicaid False Claims Act (56 Okl. St. § 1005 *et seq.* and 2007 OK. A.L.S. 137); the State False Claims Act of Rhode Island (R.I. Gen. Laws § 91.1-3); the Tennessee Medicaid False Claims Act (T.C.A.§ 71-5-181 *et seq.*); the Texas Medicaid Fraud Prevention Law (Tex. Hum. Res. Code §36.002 *et seq.);* the Vermont False Claims Act (32 V.S.A. §§630-642, *et seq*.); the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.1 *et seq.*); the Washington Medicaid Fraud False Claims Act (West's RCWA 43.131.0001 *et seq.*); the District of Columbia False Claims Act (DC ST § 2-308.03 *et seq.*); New York City False Claims Act, New York City Administrative Code §7-801-§7-810; the Municipal Code of Chicago (§1-22-010-§1-22-

060); the Philadelphia False Claims Act (19 Phila. Code §§ 3600, et seq.); and the Allegheny County (Pennsylvania) False Claims Ordinance (Code of Allegheny County, Pennsylvania Chapter 485).

2.      The violations of federal, state and municipal false claims acts arise out of false certifications and from billing for services and products not rendered.  Specifically, Defendants agreed to and were required to ship pharmaceuticals using "cold chain" methods and protocols which ensure that temperature sensitive pharmaceuticals products are transported using refrigerated packing methods that protect the integrity of the pharmaceutical products and result in an unbroken cold chain.  An unbroken cold chain is an uninterrupted series of storage and distribution activities which maintain a specified temperature range.

3.      The instant matter arises in principal part from Defendants' nationwide failure and refusal to use proper cold chain shipping methods to ship biologics pharmaceuticals either directly to patients or to wholesalers and doctors resulting in the products becoming defective, adulterated and unusable.  Many of these types of biologic drugs have very specific temperature requirements that must be adhered to at all times, including during the shipping and storage of the pharmaceutical products.

4.      Defendants' contracts with federal and government entities and programs, as well as agreements they made as Medicaid and Medicare providers of pharmaceuticals require compliance with all federal and state laws and regulations.  Entering into these agreements and adherence to the terms of those agreements are conditions of payment for pharmaceuticals supplied by Defendants to federal and state government beneficiaries.

5.      Despite having direct knowledge of the demonstrated deficiencies in their

4

shipping methods, Defendants have continued to ship temperature sensitive biologics drugs in a manner which they know will result in a substantial risk (if not an outright certainty) that those drugs will freeze and then thaw out during the course of the shipment of the drugs. In fact, Defendants participated in testing of their shipping methods which clearly demonstrated the risks of continuing to use their defective shipping methods.

6.      As a direct result of Defendants' continued shipment of adulterated drugs on a daily basis, health insurance programs funded by the United States and the Plaintiff States and municipalities (collectively the "Government Plaintiffs") including, but not limited to Medicaid, Medicare, Medicare Part D, the Railroad Retirement Medicare Program, Federal Employees Health Benefit Programs, Tri-Care (formerly CHAMPUS), CHAMPVA, State Legal Immigrant Assistance Grants and the Indian Health Service (collectively the "Programs") paid false or fraudulent reimbursement claims for adulterated drugs shipped to the Programs' beneficiaries for use and treatment. The United States and the Plaintiff States and municipalities would not have paid such false claims but for Defendants' concealment of their illegal and fraudulent conduct.

7.       Moreover Defendants' conduct endangered the health of the Programs' beneficiaries by shipping them defective and adulterated drugs that should not be used by the patients according to the Medication Guides of the manufacturers of those drugs.

8.      More specifically, Defendants' shipping methods allowed certain temperature sensitive biologics drugs to freeze during shipment and then thaw out prior to delivery, leaving patients unaware that the drugs delivered to them had become compromised, adulterated and most likely diminished in effectiveness and safety for use.

9.      Defendants' corporate executives with knowledge of the fraudulent

activities alleged herein include:  Brad Zimmerly (former Director of Logistics); Anna Umberto (VP of Procurement); Phil Nalabof (Senior VP of Specialty Operations); Carl Janssen (VP of Logistics and Engineering); Lynn Black (Senior Director of Specialty Operations); and Barry Jasilli (Head Legal Counsel for CVS).  Some of these executives were aware of the flash freezing problem as early as October 2011, but all of them were aware of the problem by March 2012 at the latest.

10.     The federal FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.  Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

11.     The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for herself and the Government, and to share in any recovery.  Based on these provisions, Plaintiff-Relator Stan Ellis seeks, through this action, to recover on behalf of the United States and the Plaintiff States and municipalities (which have laws authorizing similar *qui tam* actions) damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements and/or claims for reimbursement for unsafe shipping of biologics drugs.

12.     Defendants submitted or caused to be submitted claims for prescription drugs to federal and state health insurance programs, and Defendants knew -- and in fact it was Defendants' goal -- that their shipment of unsafe products would nonetheless cause the submission of thousands of claims to government-funded health programs for

6

prescriptions that would not have been reimbursed had those programs known of the safety issues with drugs shipped by Defendants.

13.    Defendants' unlawful efforts to conceal and continue to use defective and inadequate shipping methods for the shipment of temperature sensitive pharmaceuticals has endangered patients who are unaware that the pharmaceuticals they are receiving are likely tainted, adulterated and potentially unusable or defective.

## II.    PARTIES

14.    Plaintiff-Relator Stan Ellis brings this action on behalf the United States and the Plaintiff States to recover the millions of dollars Medicaid, Medicare, Medicare Part D, the Railroad Retirement Medicare Program, Federal Employees Health Benefit Programs, Tri-Care (formerly CHAMPUS), CHAMPVA, State Legal Immigrant Assistance Grants and the Indian Health Service have been fraudulently induced to pay as a result of false and/or fraudulent reimbursement claims for unsafe and tainted biologics pharmaceuticals submitted by, and caused to be submitted by, Defendants.

15.    Plaintiff-Relator Stan Ellis, is a resident of the State of Georgia.  Plaintiff-Relator Ellis has filed the instant *qui tam* suit seeking redress for Defendants' misrepresentations of safety and efficacy of biologics pharmaceuticals shipped through Defendants' unsafe shipping methods.  Plaintiff-Relator Ellis' suit is based upon direct and independent knowledge learned from his own investigation and testing of Defendants' shipping methods.

16.    Defendant CVS Health Corporation ("CVS Health") is a publicly traded company that, directly and/or through its subsidiaries, engages in the sale and transportation of prescription medicines in the United States and elsewhere.  In or around September 2014, Defendant CVS Health changed its corporate name from CVS Caremark

7

to CVS Health Corporation.  Defendant CVS Health is a Delaware Corporation and is headquartered in Woonsocket, Rhode Island.

17.     Defendant Advanced Care Scripts, Inc. is a Florida corporation and subsidiary of Defendant CVS Health. Upon information and belief, Advanced Care Scripts, Inc. operated or managed one or more pharmacies that shipped Humira, Enbrel, and/or Copaxone to patients.

18.     Defendant Caremark, LLC (f/k/a Caremark, Inc.), is a California corporation and subsidiary of Defendant CVS Health. Upon information and belief, Caremark, LLC operated or managed one or more pharmacies that shipped Humira, Enbrel, and/or Copaxone to patients.

19.     Caremark Puerto Rico Specialty Pharmacy, LLC is a Puerto Rico corporation and subsidiary of Defendant CVS Health. Upon information and belief, Caremark Puerto Rico Specialty Pharmacy, LLC operated or managed one or more pharmacies that shipped Humira, Enbrel, and/or Copaxone to patients.

20.     ProCare Pharmacy, LLC is a Rhode Island corporation and subsidiary of Defendant CVS Health. Upon information and belief, ProCare Pharmacy, LLC operated or managed one or more pharmacies that shipped Humira, Enbrel, and/or Copaxone to patients.

21.     ProCare Pharmacy Direct, LLC, is an Ohio corporation and subsidiary of Defendant CVS Health. Upon information and belief, ProCare Pharmacy Direct, LLC operated or managed one or more pharmacies that shipped Humira, Enbrel, and/or Copaxone to patients.

## III.    JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to

8

28 U.S.C. §1331, 28 U.S.C. §1367 and 31 U.S.C. §3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Plaintiff-Relator Stan Ellis moreover, qualifies under that section of False Claims Act as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

23.     Relator Stan Ellis shall concurrently serve upon the Attorney General of the United States, the United States Attorney for the Eastern District of Pennsylvania and the Plaintiff States Attorney Generals' offices, the complaint and a statement summarizing known material evidence and information related to Plaintiff-Relator's Complaint in accordance with the provisions of 31 U.S.C. §3730(b)(2). The disclosure statement is supported by material evidence based on Relator's direct and independent knowledge. The initial disclosure's statement and all supplements thereto and documents provided therewith are incorporated herein by reference.

24.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. §§1391(b) and 31 U.S.C. §3732(a) because those sections authorize nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, one or more Defendants can be found in, reside, and/or transact business in this District.

25.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because one or more Defendants transact business in this judicial district, and acts proscribed by 31 U.S.C. §3729 have been committed by one or more Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) & (c) and 31 U.S.C. §3732(a).

## IV.    BACKGROUND

26.    Defendants ship mail order prescription orders to all 48 contiguous U.S. States and prescription orders containing non-hazardous items to Alaska, Hawaii, Guam, American Samoa, Puerto Rico and the U.S. Virgin Islands.  Defendants also ship dozens of medications that require refrigeration.

27.    Defendants' website lists approximately 50 of the most common medications that it ships that require refrigeration.  Many of these drugs are required to be maintained at all times within a temperature range of 2º-8º Celsius.

28.    During almost the entire time period relevant to this Complaint, Defendants have used, and continue to use currently, an EPS Styrofoam packing system to ship temperature sensitive biologics pharmaceuticals to doctors, patients and clinics, inter alia.

29.    From December 2008 through May 2015, Relator Stan Ellis was employed as a Vice-President of Sales by Coldkeepers, LLC a company located in Thomasville, Georgia, which, among other things, manufactures and sells insulated thermal packaging for the transport and shipping of temperature sensitive items, including but not limited to, pharmaceuticals.

30.    More specifically, Coldkeepers invented and patented a urethane foam flexible cooler designed to allow items (including temperature sensitive pharmaceuticals) retained within an inner pouch to remain within predetermined temperature ranges for predetermined periods of time and designed to be compressed or compacted for storage or shipment to end users.

31.    In his role as Vice-President of Sales, Relator Ellis began contacting Defendants in 2010 to market Coldkeepers' innovative cooler for shipping temperature sensitive pharmaceuticals.  During his marketing efforts, Relator Ellis learned that

10

Defendants were using the EPS Styrofoam packing system to ship temperature sensitive biologics pharmaceuticals to doctors, patients and clinics, inter alia.

32.     Relator Ellis was familiar with deficiencies in the EPS Styrofoam packing system from prior sales efforts and he spent time discussing those deficiencies directly with executives from Defendants' corporations.  Specifically, Relator Ellis discussed with Defendants' corporate executives (in particular Brad Zimmerly, then the Director of Logistics), the problem or phenomenon of "flash freezing" of pharmaceuticals caused by the use of an EPS Styrofoam packing system to ship temperature sensitive biologics pharmaceuticals.

33.     During their discussions, Zimmerly admitted to Relator Ellis that Defendants had received customer complaints from patients who had received medications that were frozen.  Zimmerly also informed Relator Ellis that Defendants' customer service representatives were trained to advise patients to discard any medications that had appeared to be frozen and obtain a replacement for the medications.

34.     The EPS Styrofoam packing system involves placing a frozen gel in close proximity to the pharmaceutical that is being shipped.  This results in the internal temperature of the package and its contents dropping in the first 90 minutes after the frozen gel is placed near the pharmaceutical; during which time the temperature of the pharmaceutical being shipped drops below 2° Celsius.  The process causes the formation of ice crystals and separates water from the medication thereby damaging the pharmaceutical and reducing its efficacy.

35.     The flash freezing of the pharmaceuticals shipped in the EPS Styrofoam packing system can reduce the shelf life of the medication, diminish the physical integrity

11

of the medication and cause the partial or total loss of the effectiveness of the medication.

36. As part of the sales discussions between Relator Ellis and Defendants, Defendants retained an independent laboratory (WuXi App Tech in Georgia) to conduct independent testing of drugs stored in the same EPS Styrofoam packing system used by Defendants. Defendants shipped samples of Humira, Enbrel and Copaxone to the laboratory. This testing took place from September 6 through September 16, 2011.

37. The WuXi laboratory, under the supervision of Defendants' corporate executives, packed the pharmaceuticals in the EPS Styrofoam packing system used by Defendants and simulated the outside temperature conditions typical of shipping using industry approved standards while using a probe to monitor the temperature of the contents inside the EPS Styrofoam packing system.

38. The WuXi laboratory tested several variations in the packing methods, all using the EPS Styrofoam packing system, to determine whether the EPS Styrofoam packing system itself, or the packing process (how and where the frozen gel packs were placed in the EPS cooler) was causing the flash freezing of the contents.

39. The testing countenanced by Relator Ellis and Defendants and conducted by the WuXi laboratory showed that pharmaceuticals shipped in the EPS Styrofoam packing system used by Defendants, in every variation of how it was packed would flash freeze in the first ninety minutes after it was packed and then eventually thaw out over time. In October 2011, Defendants' employee, Brad Zimmerly, sent Relator Ellis an e-mail showing the test results of the WuXi laboratory tests.

40. Subsequently, in 2011, Defendants agreed to pay for a second round of independent testing to see if their current EPS Styrofoam packing system was sufficiently

preserving the proper temperatures for the cold shipment of pharmaceuticals. Defendants used a different independent laboratory (The Illuminate Group in Tampa, Florida) than the previous round of testing.

41.    Defendants again shipped samples of Humira, Enbrel and Copaxone to The Illuminate Group laboratory and this laboratory conducted similar tests using the EPS Styrofoam packing system and included a temperature probe to record the temperature of the package during simulated shipping conditions.

42.    This second set of tests confirmed that pharmaceuticals packed using the EPS Styrofoam packing system would flash freeze and then over time thaw out. The test results from The Illuminate Group essentially mirrored the results from the tests performed by WuXi.

43.    Brad Zimmerly advised Relator Ellis that Defendants had contemplated doing further chromatography testing to see if medications that had flash frozen had lost potency or efficacy but they declined to do so in part because of the costs of that testing which could be several thousand dollars per test.

44.    By at least March 2012, if not sooner, several of Defendants' corporate executives were aware of the flash freezing problems that occurred using the EPS Styrofoam packing system to ship temperature sensitive pharmaceuticals. Anna Umberto, CVS Caremark's Vice-President of Strategic Procurement acknowledged in a March 26, 2012 e-mail to Relator Ellis that Defendants were not questioning the results of the "prior tests" conducted by the WuXi and The Illuminate Group independent laboratories.

**A.    Defendants Begin Using Coldkeeper's Packing Methods At Some Shipping Facilities**

45.    The problematic results of Defendants' testing of their EPS Styrofoam

packing system convinced some of Defendants' corporate executives to look for a replacement for that packing system. Nonetheless, despite knowing in March 2012 (or perhaps earlier) that they had a flash freezing problem, Defendants waited several months until October 2012 before beginning the Request For Proposal ("RFP") process seeking to replace the EPS Styrofoam packing system that was causing the flash freezing.

46.     In the Fall of 2012 Coldkeepers submitted a RFP proposing that Defendants implement using Coldkeepers' urethane foam flexible cooler as a replacement for the EPS Styrofoam packing system in shipping temperature sensitive pharmaceuticals.

47.     In or around March 2013, Coldkeepers won Defendants' contract and Defendants began using Coldkeepers' urethane foam flexible cooler as a replacement for the previously used EPS Styrofoam packing system at some of their shipping facilities.

48.     Over time, however, Relator Ellis learned that despite Coldkeepers winning the RFP bidding process for the Defendants' shipment products, at least some of Defendants' pharmaceutical shipping facilities were continuing to use the EPS Styrofoam packing system rather than Coldkeepers' urethane foam flexible cooler.

49.     Relator Ellis learned that some of Defendants' corporate executives were more concerned with Defendants preserving their business relationships with the office product company Staples and other vendors rather than implementing the contract with Coldkeepers. Staples supplied the Styrofoam coolers used in EPS Styrofoam packing system to Defendants. Defendants in turn supplied pharmaceuticals to Staples' employees pursuant to Staples' health insurance plan.

50.     As a result of the concern about the business relationship between Defendants and Staples, some of Defendants' facilities ignored Defendants' contract to use

Coldkeepers' packing products and instead continued to use the EPS Styrofoam packing system and Styrofoam coolers supplied by Staples.

51.     Additionally, some of Defendants' corporate executives complained that the Coldkeepers' packing system required additional time and labor because the Coldkeepers liner had to be placed into a cardboard box for use.  These executives preferred that Defendants use the EPS coolers since they were already assembled and thus, in their view, were easier to use.

52.     In May 2014, Coldkeepers terminated its contract with Defendants because of Defendants' non-compliance with the contract and their continued use of alternatives to Coldkeepers' shipping products despite the contract.  Coldkeepers stopped sending Defendants its packing products in or around May 2014.

53.     Relator Ellis visited Defendants' Monroeville, Pennsylvania facility in the Summer of 2014.  Whereas that facility had used the Coldkeepers system during 2013 and earlier in 2014, by the time of Relator Ellis' visit in the Summer of 2014 that facility was already back to using the same EPS Styrofoam packing system that Defendants had previously used. Upon information and belief, Defendants presently continue to use the EPS Styrofoam packing system and the Styrofoam coolers supplied by Staples.

## V.     APPLICABLE LAW

### A.     Federal Statutes And FDA Regulations Pertaining To Cold Chain And The Adulteration Of Pharmaceuticals

54.     21 U.S.C. §351(a)(1)(B) provides:  "A drug or device shall be deemed to be adulterated - - (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such

15

drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."

55. 21 U.S.C. §351(b) provides: "A drug or device shall be deemed to be adulterated - - (b) **Strength, quality, or purity differing from official compendium** If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium.

56. Federal regulations address the storage and shipment of temperature sensitive pharmaceuticals. For example, 21 CFR 203.32 "Prescription Drug Marketing-Drug sample storage and handling requirements" contains two subparts that require that (a) "storage and handling conditions" not adversely affect the drug and (b) manufacturers, distributors of record, and their representatives comply with all compendial and labeling requirements."

57. Additionally, 21 CFR 203.36 "Fulfillment houses, shipping and mailing services, comarketing agreements, and third-party recordkeeping" looks at comarketing agreements with any third party involved in shipping and storing drug samples. This section states that the manufacturer or distributor is responsible for record keeping and documentation and must comply with the Prescription Drug Marketing Act (PDMA) and amendments.

58. 21 CFR 211.142(b) addresses minimum requirements for the storage and handling of prescription drugs and requires the: "(b) Storage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength,

quality and purity of the drug products are not affected.

59. 21 CFR 211.150 of Subpart H: Holding and Distribution – "Distribution Procedures" states that these products must be shipped within: " . . . appropriate temperatures and under appropriate conditions in accordance with requirements, if any, in the labeling of such drugs, or with the requirements in the current edition of an official compendium, such as the United States Pharmacopeia/National Formulary (USP/NF)."

60. 21 CFR 211.150(2) further provides: "Appropriate manual, electromechanical, or electronic temperature and humidity recording equipment, devices, and/or logs shall be utilized to document proper storage of prescription drugs."

61. 21 CFR 211.150(3) further provides: The recordkeeping requirements in paragraph (f) of this section shall be followed for all stored drugs. Paragraph (f) "Recordkeeping" states that drug distributors must maintain records and inventories that show receipt and distribution or "other disposition" of prescription drugs. These records must include the source of the drugs, the address and location that the drugs were shipped from, the identity and quantity, and the dates of receipt/distribution/other disposition. Records must be kept and accessible for inspection for 3 years after the date of their creation."

### 1. Prescription Drug Reimbursement in Federal Health Care Programs

#### a. The Medicaid Act

62. Title XIX of the Social Security Act is a program that provides medical assistance for certain individuals and families with low incomes and resources. The program, known as Medicaid, became law in 1965 as a jointly funded cooperative venture

between the Federal and State governments to assist States in the provision of adequate medical care to eligible needy Americans. Among the groups of people served by Medicaid are eligible low-income parents and children. Among the health benefits funded primarily by Medicaid, up until January 1, 2006, was funding for the prescription drug needs of the Program's beneficiaries.

63. A State must have a plan for medical assistance that has been approved by the Centers for Medicare and Medicaid Services (CMS), which administers the program on behalf of the Secretary of Health and Human Services to participate in the Medicaid program.

64. The state plan must specify, among other things, the specific kinds of medical care and services that will be covered. 42 U.S.C. § 1396a(a)(10) and (17). If the plan is approved by the Secretary, the State thereafter is eligible for federal financial participation, *i.e.,* reimbursement by the federal government for a specified percentage of the amounts that qualify as medical assistance under the state plan. *Id.* at §§ 1396b(a)(I), 1396d(b).

65. States are accorded a broad measure of flexibility in tailoring the scope and coverage of their plans to meet the particular needs of their residents and their own budgetary and other circumstances. While the Medicaid Act requires States to provide certain basic services, the Act permits, but does not require, States to cover prescription drugs, although most States choose to do so. 42 U.S.C. § 1396d(a)(12).

66. In 1990, Congress enacted the Medicaid Drug Rebate Statute, codified at 42 U.S.C. §1396r-8, to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private

18

purchaser." H.R. Rep. No. 881, 101st Cong., 2d Sess. 96 (1990).

67. That statute prohibits federal financial participation for covered outpatient drugs unless there is a rebate agreement in effect under section 1396r-8. See 42 U.S.C. §§ 1396b(i)(10)(A) and 1396r-8(a)(I). Once a drug manufacturer has entered into a rebate agreement for a covered outpatient drug, a State is generally required to cover that drug under the state plan.

### b.    Other Federal Health Care Programs

68. In addition to Medicaid, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to Medicare, CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit Program ("FEHBP"). These programs, described below, have been harmed by Defendants' conduct in that they have been caused by Defendants to pay false and/or fraudulent claims as a direct result of the conduct complained of in this Complaint.

## VI.    DEFENDANTS' HEALTH ENTITIES IN MEDICARE PART D PROGRAM

69. Defendants claim to be the largest provider of prescriptions and related health care services in the United States, having handled well over one billion prescriptions since 2007.

70. Defendants operate retail, mail order, pharmacy benefit management ("PBM"), Medicare Plan D Sponsor and pharmacy services businesses. In 2010, Defendants'' PBM handled approximately 585 million prescriptions, and their pharmacy business filled approximately 636 million retail prescriptions, accounting for 18% of the entire pharmacy market.

71. In their PBM business, Defendants' plan members access their prescriptions

19

by mail or in one of Defendants' network of more than 68,000 retail pharmacies. Defendants' PBM offers mail order pharmacy services, specialty pharmacy services, plan design and administration, formulary management and claims processing.

72.    Upon information and belief, Defendants' PBM's largest customer is the Federal Employees Health Benefits Plan ("FEHBP").

73.    Defendants are also Medicare Part D Sponsors.  In 2005, CVS Health formed SilverScript Insurance Company to participate as a Medicare Part D Plan sponsor ("PDP").  SilverScript Insurance Company is licensed in all 50 states, Puerto Rico and the District of Columbia.

74.    Since 2006, Silverscript has been approved by CMS as a prescription drug plan (PDP) Sponsor under Medicare Part D in all regions of the United States.  Silverscript currently profits from Part D plans in all 50 states, Puerto Rico and the District of Columbia.

75.    Since 2006, Defendants have provided Part D PBM services to Defendants' Plan D Sponsors and to other Part D Sponsor corporations.

76.    Defendants also boast on their website that it is America's leading retail pharmacy with more than 9,500 locations nationwide.

77.    These retail pharmacies and other businesses of Defendants, including mail order, on-line and specialty pharmacies process and dispense Part D drugs to Medicare beneficiaries.

78.    Defendants' net revenues from the Medicare Part D Program include sponsor payments received from CMS, payments to their PBMs, profits from their on-line and mail order pharmacy operations.

## VII.   ALLEGATIONS

**A.   Defendants Knowingly And Intentionally Have Shipped And Continue To Ship Adulterated And Defective "Flash Frozen" Pharmaceuticals To Patients That Receive Pharmaceuticals Pursuant To Federally Funded Programs.**

79.   Upon information and belief, Defendants have had knowledge since at least March 2012 that use of their EPS Styrofoam packing system causes flash freezing and subsequent thawing of temperature sensitive pharmaceuticals shipped to patients.

80.   To this date, Defendants still utilize their EPS Styrofoam packing system even though they know that temperature sensitive pharmaceuticals shipped to patients using that packaging process are certain or at least very likely to flash freeze and then thaw out during shipping.

81.   In addition, but for Defendants' concealment of the known problems with their shipping methods for temperature sensitive pharmaceuticals, Defendants would not have been paid for pharmaceuticals shipped to patients reimbursed by government-funded health care programs.

82.   The flash freezing of many of the temperature sensitive pharmaceuticals shipped by Defendants renders these pharmaceuticals defective and unusable according to the manufacturers' "Medication Guide" for those particular pharmaceuticals.

83.   For example, for the medication Humira, a medication that Defendants ship to patients, the Medication Guide states:  "Store HUMIRA in the refrigerator between 36ºF to 46ºF (2ºC to 8ºC).  Store HUMIRA in the original carton until use to protect it from light.  **Do not** freeze HUMIRA.  **Do not** use HUMIRA if frozen, even if it has been thawed."  (Emphasis in the original).

84.   Published data shows that it is very important for medications like Humira

21

to be stored under proper conditions to preserve its protein structure.  If not, freezing has been shown to reduce the efficacy and safety of Humira by altering the protein structure.

85.     Likewise, for the medication Enbrel, another medication that Defendants ship to patients, the Medication Guide states:  "Store Enbrel in the refrigerator between 36ºF to 46ºF (2ºC to 8ºC). . . . **Do not freeze**."  (Emphasis in the original).

86.     Moreover, for the medication Copaxone, another medication that Defendants ship to patients, the Medication Guide states:  "Keep your monthly supply of COPAXONE Pre-filled syringes refrigerated between 36ºF to 46ºF (2ºC to 8ºC).  **Never freeze your COPAXONE Pre-filled syringes.  If they do accidentally freeze, do not use, and discard in a proper container."**  (Emphasis added).

87.     The Medication Guides for numerous other temperature sensitive pharmaceuticals shipped by Defendants to patients contain similar instructions directing patients not to use and to discard frozen medications, even if they subsequently thawed out.

88.     The financial cost of Defendants' fraudulent actions to the United States and the Plaintiff States through Medicaid, Medicare, Medicare Part D, the Railroad Retirement Medicare Program, Federal Employees Health Benefit Programs, Tri-Care (formerly CHAMPUS), CHAMPVA, State Legal Immigrant Assistance Grants and the Indian Health Service has been substantial.

**VIII. GOVERNMENT FUNDED HEALTHCARE PROGRAMS WERE DAMAGED BY PAYING FALSE CLAIMS FOR DAMAGED AND ADULTERATED FLASH FROZEN PHARMACEUTICALS SHIPPED BY DEFENDANTS**

89.     In addition to Medicaid, the federal government reimburses a portion of the cost of prescription drugs under several other health care programs, including but not limited to Medicare, Medicare Part D, the Railroad Retirement Medicare Program, Federal

Employees Health Benefit Programs, Tri-Care (formerly CHAMPUS), CHAMPVA, State Legal Immigrant Assistance Grants and the Indian Health Service, as alleged below.

90.     As alleged below, these programs operate in similar ways to the Medicare program.  For example, the VA and CHAMPUS/Tri-care operate in substantially similar ways to the Medicare and Medicaid programs, but primarily for the benefit of military veterans, their spouses (or widowed spouses) and other beneficiaries.

91.     Coverage of drug use under these programs is similar to coverage under the Medicaid program.

A.     **Medicaid**

92.     Title XIX of the Social Security Act is a program which provides medical assistance for certain individuals and families with low incomes and resources.  The program, known as Medicaid, became law in 1965 as a jointly funded cooperative venture between the Federal and State governments to assist States in the provision of adequate medical care to eligible needy Americans.  Among the groups of people served by Medicaid are eligible low-income parents and children.

93.     The Medicaid Program (42 U.S.C. § 1395, *et seq.*) is administered through the Centers for Medicare and Medicaid Services (CMS), which is a division of the Department of Health and Human Services (HHS) of the federal government.

B.     **Medicare and Medicare Part D**

94.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States.  The health insurance provided to beneficiaries of the Medicare insurance program is paid in whole or in part by the United States.  Medicare was promulgated to provide payment for medical services, durable

medical equipment and other related health items for individuals ages 65 and over. Medicare also makes payment for certain health services provided to additional classes of needy classes of individual healthcare patients pursuant to federal regulation.

95.    On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA"). Title I of the MMA created new outpatient prescription drug coverage under Medicare ("Medicare Part D").

96.    Medicare Part D went into effect on January 1, 2006. The Program is administered by the United States Department of Health and Human Services, Centers for Medicare and Medicaid ("CMS"). For "dual eligibles," defined as individuals who received prescription drug coverage under Medicaid in addition to Medicare coverage for other health care in 2005, enrollment in Medicare Part D was compulsory. Such beneficiaries were automatically switched to Part D plans for 2006 and commenced receiving comprehensive prescription drug coverage under Medicare Part D.

97.    Coverage of prescription drugs under Medicare Part D is subject to the same regulations as coverage under the Medicaid Program described above.

98.    As a direct, proximate and intended result of the conduct of Defendants alleged herein, in violation of the federal False Claims Act and the analogous laws of the Plaintiff States and municipalities, the Medicare and Medicare Part D programs have been damaged.

C.    **The Railroad Retirement Medicare Program**

99.    The Railroad Retirement Medicare program is authorized by the Railroad Retirement Act of 1974, at 45 U.S.C. §231 *et seq*. It is administered through the United States Railroad Retirement Board, "RRB," and furnishes Medicare coverage to retired

24

railroad employees.

100.   As a direct, proximate and intended result of the conduct of Defendants alleged herein in violation of the federal False Claims Act and the analogous laws of the Plaintiff States and municipalities, the RRB program has been damaged.

**D.      Federal Employee Health Benefit Plans**

101.   The Federal Employees Health Benefits Program ("FEHBP") is administered by the United States Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §8901 *et seq.* and provides health care coverage to federal employees, retirees and their dependants and survivors.

102.   As a direct, proximate and intended result of the conduct of Defendants alleged herein in violation of the federal False Claims Act and the analogous laws of the Plaintiff States and municipalities, the FEHBP program has been damaged.

**E.      Tri-Care**

103.   The Tri-Care program, formerly CHAMPUS, is administered by the United States Department of Defense through its component in agency, CHAMPUS, under the authority of 10 U.S.C. §§1701-1106.  It is a health care program that provides for care in civilian facilities for members of the uniformed services and their dependents.

104.   As a direct, proximate and intended result of the conduct of Defendants alleged herein in violation of the federal False Claims Act and the analogous laws of the Plaintiff States and municipalities, the Tri-care Program has been damaged.

**F.      The Veterans Administration**

105.   The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") is a comprehensive health care program in which the VA shares

25

the cost of covered health care services and supplies with eligible beneficiaries. The program is administered by Health Administration Center and its offices are located in Denver, Colorado. In general, the CHAMPVA program covers most health care services and supplies that are medically necessary.

106. Due to the similarity between CHAMPVA and the Department of Defense ("DoD") Tri-Care program, the two are often mistaken for each other. CHAMPVA is a Department of Veterans Affairs program whereas Tri-Care is a regionally managed health care program for active duty and retired members of the uniformed services, their families and survivors. In some cases a veteran may appear to be eligible for both/either program on paper. However, military retirees, or the spouse of a veteran who was killed in action, are and will always be Tri-Care beneficiaries.

107. Pursuant to 38 U.S.C. §8126, and the regulations based thereon, and contracts the Veterans Administration had with manufacturers, drugs furnished to the Veterans' Administration by drug manufacturers must be furnished at the best price.

108. The VA and CHAMPUS/Tri-care operate in substantially similar ways to the Medicare and Medicaid programs, but primarily for the benefit of military veterans, their spouses (or widowed spouses) and other beneficiaries.

109. As a direct, proximate and intended result of the conduct of the Defendants alleged herein in violation of the federal false claims act and the analogous laws of the Plaintiff States, the CHAMPVA program has been damaged.

### G.    Indian Health Service

110. The Indian Health Service is responsible for providing comprehensive health services to more than 1,400,000 Americans. It is administered by the department of

health and human services pursuant to 42 U.S.C.A. 2002 *et seq.* The statute authorizes the Secretary to enter into contracts with independent providers to furnish health services to Native Americans whenever the Secretary determines that independent providers can better meet the population's need. As a direct, proximate and intended result of the conduct of Defendants alleged herein in violation of the federal false claims act and the analogous laws of the Plaintiff States, the Indian Health Service has been damaged.

### H.    State Legal Immigrant Assistance Grants

111.    Relator is informed and believes and based thereon alleges that the United State also furnishes funds which several States use to pay for such drugs pursuant to State Legal Immigrant Assistance Grants ("SLIAG"), 8 U.S.C.A §1255A; 45 C.F.R. §402.10.

112.    As a direct, proximate and intended result of the conduct of the Defendants alleged herein in violation of the federal false claims act and the analogous laws of the Plaintiff States, the SLIAG program has been damaged.

### COUNT ONE

**Violations of Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)1**

113.    Plaintiff incorporates by reference and re-allege all of the foregoing paragraphs as if fully set forth herein. This Count is brought by Plaintiff-Relator Stan

---

1 For all unlawful conduct for which Defendants are liable under this Count, and for all false claims they caused to be submitted, that occurred after May 20, 2009, the date on which Congress amended and renumbered the False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA as amended by FERA, specifically, 31 U.S.C. §3729(A)(1)(A).

27

Ellis in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729.

114.    By virtue of the above-described acts, Defendants knowingly caused to be presented false or fraudulent claims for compromised and adulterated drugs for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States.

115.    Plaintiff United States, unaware of the falsity of the claims and/or statements caused to be made by Defendants and in reliance on the accuracy thereof, paid said Defendants for claims that would otherwise not have been allowed.

116.    The amounts of the false or fraudulent claims caused by the Defendants to be submitted to the United States were material.  By reason of Defendants' wrongful conduct, the United States has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim caused to be submitted by Defendants.

117.    Relator-Plaintiff believes and avers that he is an original source of the facts and information on which this action is based.

## COUNT TWO

### Violations of False Claims Act

### 31 U.S.C. § 3729(a)(2) 2

---

2 For all unlawful conduct for which Defendants are liable under this Count, and for all false claims they caused to be submitted, that occurred after May 20, 2009, the date on which Congress amended and renumbered the False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No.

28

118. Plaintiff incorporates by reference and re-allege all of the foregoing paragraphs as if fully set forth herein. This Count is brought by Plaintiff-Relator Stan Ellis in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for Defendants' violation of 31 U.S.C. § 3729(a)(2).

119. By virtue of the above-described acts, Defendants knowingly caused to be made or used false records or statements to get false or fraudulent claims for payment or approval by the United States, and continue to make, use or cause false records and statements to be made or used to get false or fraudulent claims for adulterated and potentially dangerous drugs paid or approved by the United States.

120. Plaintiff United States, unaware of the falsity of the records and/or statements caused to be made and used by Defendants, and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims for adulterated and potentially dangerous drugs that were ineligible for reimbursement and would not have been paid or approved if any part of the truth were known.

121. The amounts of the false or fraudulent claims caused by the Defendants to be submitted to the United States were material. By reason of Defendants' wrongful conduct, the United States has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false statement caused to be made or used by Defendants.

---

111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA as amended by FERA, specifically, 31 U.S.C. §3729(A)(1)(A).

122.    Plaintiff-Relator believes and avers that he is an original source of the facts and information on which this action is based.

## COUNT THREE

## Violations of the False Claims Act,

## 31 U.S.C. §3729(a)(3) 3

123.    Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.  Defendants entered into conspiracies with paid consultants and public officials for the purpose of defrauding the Plaintiff United States.

124.    By the foregoing acts and omissions, Defendants took actions in furtherance of their conspiracies, including but not limited to concealing known problems with their defective pharmaceutical shipping methods from patients and from the United States.

125.    By the foregoing acts and omissions, Defendants entered into these unlawful conspiracies to defraud the United States by causing false and fraudulent claims to be paid and approved in violation of the False Claims Act, 31 U.S.C. §3729(a)(3).

126.    At all times relevant to the complaint, Defendants acted with the requisite knowledge that their shipping methods for biologic pharmaceuticals that required cold temperature control were defective and often resulted in the freezing and adulteration of those pharmaceuticals.

---

3 For all unlawful conduct for which Defendants are liable under this Count, and for all false claims they caused to be submitted, that occurred after May 20, 2009, the date on which Congress amended and renumbered the False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA as amended by FERA, specifically, 31 U.S.C. §3729(A)(1)(A).

127.    As a direct and proximate consequence of Defendants' conspiratorial conduct, the United States has suffered significant, material financial damages in an amount to be proved at trial.  The United States *ex rel.* Plaintiff-Relator is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each ineligible claim submitted to the United States for payment.

## COUNT FOUR

**Violations of the California False Claims Act**

**Ca. Government Code §12650 *et seq.***

128.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

129.    This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of California under the *qui tam* provisions of the California False Claims Act, California Government Code §12651(a) pursuant to which treble damages and civil penalties are sought.

130.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals, including biologics in the State of California.

131.    Cal. Gov't Code §12651(a) provides liability for the costs of a civil action, a civil penalty of up to $10,000 and treble damages for all damages sustained by the state for any person who-

(1)  knowingly presents, or causes to be presented, to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or any political subdivision;

31

(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4) is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

132. By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of California, for drugs that have been compromised and are dangerous because of demonstrably deficient "cold chain" shipping methods.

133. Specifically, Defendants have:

• caused thousands of false claims to be presented to the State of California,

• knowingly made, used or caused to be made or used false records to get false claims paid,

• conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

• failed to disclose the existence of the false claims they have caused to be presented.

134. The amounts of the false or fraudulent claims to the State of California were material.

32

135.     Plaintiff State of California, being unaware of the falsity of the claims caused to be submitted by Defendants and in reliance on the accuracy thereof paid and continues to pay for improperly shipped biologics pharmaceuticals.

## COUNT FIVE

### Colorado Medicaid False Claims Act

### Colo. Rev. Stat. § 25.5-1-104 *et seq.*

136.     Relator Ellis incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

137.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

138.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

139.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

140.     The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

141.     By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

33

142.    The State of Colorado is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SIX

### Connecticut False Claims Act

### Chapter 319v, Sec. 17b-301 *et seq.*

143.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

144.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

145.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut Government for payment or approval.

146.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut Government to approve and pay such false and fraudulent claims.

147.    The Connecticut Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

148.    By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

149.    The State of Connecticut is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**COUNT SEVEN**

**Violations of the Delaware False Claims Act**

**Del. Stat. Tit. VI. §1201**

150.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Delaware under the *qui tam* provisions of the Delaware False Claims and Reporting Act, Delaware Statute Title VI, Section 1201.

151.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Delaware.

152.    The Delaware False Claims and Reporting Act, 6 Del Code Ann. §1201(a)(1)  provides for liability for any person who:   knowingly presents or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval; . . . shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of the actual damages which the Government sustains because of the act of that person.

153.    The Delaware False Claims and Reporting Act, 6 Del. C. §1201(a)(2) provides for liability for any person who: knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; …shall be liable to the Government for a civil penalty of not less than

35

$5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of the actual damages which the Government sustains because of the act of that person.

154. The Delaware False Claims and Reporting Act, 6 Del. C. §1201(a)(3), provides for liability for any person who: Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . . shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of the actual damages which the Government sustains because of the act of that person.

155. By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Delaware, for unsafe and adulterated pharmaceuticals. Specifically, Defendants have:

- caused hundreds or thousands of false claims to be presented to the State of Delaware,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

156.    The amounts of the false or fraudulent claims to the State of Delaware were material.

157.    Plaintiff State of Delaware, being unaware of the falsity of the claims caused to be submitted by the Defendants, and in reliance on the accuracy thereof paid and continues to pay for adulterated and potentially dangerous drugs.

## COUNT EIGHT

### District of Columbia False Claims Act
### D.C. Code Ann. § 2-308.14 (a)(1)-(3), (7)

158.    Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

159.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

160.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

161.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

162.    By virtue of the acts described above, Defendants conspired with others to defraud the District of Columbia by inducing the District of Columbia Government to pay or approve false or fraudulent claims.

37

163.     The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

164.     By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

165.     The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT NINE

### Violations of the Florida False Claims Act
### Fl. Stat. §§68.081-68.09

166.     Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

167.     This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Florida under the *qui tam* provisions of Florida False Claims Act, Fl. Stat. §§68.081-68.09.

168.     Defendants   at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Florida.

169.     Fla. Stat § 68.082(2)(a)-(c) provide liability for any person who-

(a)     Knowingly presents, or causes to be presented, to an officer or employee of an agency, a false or fraudulent claim for payment or approval; … Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim

paid or approved by an agency;. . . is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

(b)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;. . . is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

(c)    Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid; …is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

170.    By virtue of the above-described acts, among others, Defendants caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Florida, for adulterated and potentially dangerous pharmaceuticals.

171.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Florida,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

39

- failed to disclose the existence of the false claims they have caused to be presented.

172. The amounts of the false or fraudulent claims to the State of Florida were material.

173. Plaintiff State of Florida, being unaware of the falsity of the claims caused to be submitted by the Defendants, and in reliance on the accuracy thereof paid and continues to pay for adulterated and potentially dangerous drugs.

### COUNT TEN

### Violations of the Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq.*

174. Plaintiff Ellis incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

175. This is a *qui tam* action brought by brought by Relator Stan Ellis and the State of Georgia to recover treble damages, civil penalties and the cost of this action, under the Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et. seq.*

176. Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Georgia.

177. Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a), specifically provides in part:

(a) Any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid

program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

…shall be liable to the State of Georgia for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

178.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

179.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Georgia,

- knowingly made, used or caused to be made or used false records to get false claims paid;

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

180.    For example, Defendants failed to disclose that they were selling and shipping pharmaceuticals with a defective cold chain process resulting in the adulteration of the drugs that they sold and shipped.  As a result of this illegal scheme, these claims were improper in whole pursuant to the Georgia State False Medicaid Claims Act.

181. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

182. Each drug that was adulterated as a result of Defendants' improper shipping practices represents a false or fraudulent record or statement. Each claim for reimbursement for such adulterated drugs submitted to a State-funded health insurance program represents a false or fraudulent claim for payment.

183. Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented over many years.

184. The Georgia State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid and continues to pay the claims that would not be paid if it knew of Defendants' shipping practices.

185. By reason of Defendants' acts, the Georgia State Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

186. Georgia is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

187. Defendants did not, within a reasonable period of time after first obtaining information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

188.    Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Georgia State False Medicaid Claims Act on behalf of himself and the State of Georgia.

189.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

## COUNT ELEVEN

### Violations of the Hawaii False Claims Act
### Haw. Rev. Stat. §661-21 *et seq.*

190.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Hawaii under the *qui tam* provisions of Hawaii False Claims Act, Haw. Rev. Stat. §661-21 *et seq.*

191.    Defendants  at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Hawaii.

192.    The Hawaii False Claims Act, Haw. Rev. Stat § 661-21(a)(1)-(3) specifically provides that any person who:

(1)    Knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;…

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;…

(3)    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;…

43

*     *     *

Shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the state sustains due to the act of that person.

193.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Hawaii, for adulterated pharmaceuticals.

194.    Specifically, Defendants have:

•     caused thousands of false claims to be presented to the State of Hawaii,

•     knowingly made, used or caused to be made or used false records to get false claims paid,

•     conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

•     failed to disclose the existence of the false claims they have caused to be presented.

195.    The amounts of the false or fraudulent claims to the State of Hawaii were material.

196.    Plaintiff State of Hawaii, being unaware of the falsity of the claims caused to be submitted by Defendants, and in reliance on the accuracy thereof paid and continues to pay for improperly shipped adulterated drugs.

44

## COUNT TWELVE

### Violations of the Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175/1 *et seq.*

197.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Illinois under the *qui tam* provisions of 740 ILCS 175/4 for Defendants' violation of 740 ILCS 175/3.

198.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Illinois.

199.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §175/3 (a)(1)-(3), specifically provide that any person who:

(1)    Knowingly presents, or causes to be presented, to an officer or employee of the State or member of the Guard a false or fraudulent claim for payment or approval;…

(2)    Knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;…

(3)    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;. . .

(a)        is liable to State for civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person.

200.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or

45

indirectly, to officers, employees or agents of the State of Illinois, for adulterated pharmaceuticals.

201.    Specifically, Defendants have:

•       caused thousands of false claims to be presented to the State of Illinois,

•       knowingly made, used or caused to be made or used false records to get false claims paid,

•       conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

•       failed to disclose the existence of the false claims they have caused to be presented.

202.    The amounts of the false or fraudulent claims to the State of Illinois were material.

203.    Plaintiff State of Illinois, being unaware of the falsity of the claims caused to be submitted by the Defendants, and in reliance on the accuracy thereof paid and continues to pay for improperly shipped adulterated drugs.

## COUNT THIRTEEN

### Violations of the Indiana False Claims and Whistleblower Act
### (IC 5-11-5.5 *et seq.*)

204.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

205.    This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Indiana under the *qui tam* provisions of IC 5-11-5.5-4, for the Defendants' violations of IC 5-11-5.5-2.

46

206. Defendants, at all times relevant to this action, sold and shipped and continue to sell and ship pharmaceuticals into the State of Indiana.

207. The Indiana False Claims and Whistleblower Act, Ind. Code § 5-11-5.5-2(b) (2008), specifically provides that by engaging in certain acts a person commits an unlawful act and shall be liable to the state for civil penalties of at least $5,000 and for up to three times the amount of damages that the state sustains because of the act of that person, including:

(1)     Presents a false claim to the state for payment or approval; or

(2)     making or using a false record or statement to obtain payment or approval of a false claim from the state; . . . or

i.     conspiring with another person to perform an act described above; or

Causing or inducing another person to perform an act described [above].

208. Through the acts described above and otherwise, Defendants knowingly caused to be presented for payment and approval to the Indiana Medicaid program, possibly continue to cause to be presented, directly or indirectly, to officers, employees or agents of the State of Indiana, false and fraudulent claims in order to induce Medicaid reimbursement for adulterated drugs, that were not eligible for any such reimbursement.

209. Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Indiana,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; ; and,

- failed to disclose the existence of the false claims they have caused to be presented.

210.   As a result, Plaintiff Indiana reimbursed Medicare and Medicaid participating providers for ineligible claims for payment for adulterated drugs, resulting in material financial losses to the State of Indiana.

211.   Plaintiff State of Indiana, unaware of the falsity of the claims caused to be presented by Defendants, and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims for adulterated drugs that would not have been paid or approved in any part if the truth were known.

212.   By reason of Defendants' wrongful conduct, Indiana has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the State's false claims act in an amount to be determined at trial, plus civil penalties for each such false statement caused to be made by Defendants.

### COUNT FOURTEEN

**Iowa Medicaid False Claims Act**
**Iowa Code Ann. §685.1 *et seq.***

213.   Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

214.   This is a claim for treble damages and penalties against Defendants on behalf of the State of Iowa under the Iowa Medicaid False Claims Act, Iowa Code §685.1 *et seq.*

215.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for drugs they sold and/or shipped to the State of Iowa.

216.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Iowa to approve and pay such false and fraudulent claims.

217.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' concealment of their improper shipping practices.

218.    By reason of the Defendants' unlawful acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

219.    The State of Iowa is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants plus treble damages.

## COUNT FIFTEEN

### Violations of the Louisiana Medical Assistance

### Programs Integrity Law Louisiana Rev. Stat. §437 *et seq.*

220.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Louisiana under the *qui tam* provisions of the Louisiana Medical Assistance Programs Integrity Law, Louisiana Rev. Stat. §437 *et seq.*

221.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Louisiana.

222.    The Louisiana False Claims Act/Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46-438.3 provides:

(A)    No person shall knowingly present or cause to be presented a false or fraudulent claim.

(B)    No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

(C)    No person shall knowingly make, use, or cause to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

223.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Louisiana, for adulterated drugs.

224.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Louisiana,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

225.    The amounts of the false or fraudulent claims to the State of Louisiana were material.

50

226.    Plaintiff State of Louisiana, being unaware of the falsity of the claims caused to be submitted by the Defendants, and in reliance on the accuracy thereof paid and continues to pay for adulterated drugs shipped by Defendants.

## COUNT SIXTEEN

### Maryland False Health Claims Act of 2010
### Subtitle 6, False Claims Against State Health Plans and
### State Health Programs, § 2-601 *et seq.*

227.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

228.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act of 2010, Subtitle 6.

229.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

230.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

231.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that it would not have paid had it known about Defendants' improper shipping practices.

232.    By reason of the Defendants' actions, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

51

233.    The State of Maryland is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SEVENTEEN

### Violations of the Massachusetts False Claims Act
### Massachusetts Gen. Laws c.12 §5(A)

234.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Massachusetts under the *qui tam* provisions of the Massachusetts False Claims Act, Massachusetts Gen. Laws c.12 §5(A).

235.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the Commonwealth of Massachusetts.

236.    The Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12, §5(B)(1)-(3)*,* provides in part, that any person who:

(1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment; …

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;  …

(3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim; …

*    *    *

shall liable to the commonwealth or political subdivision for a civil penalty of not

less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

237.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the Commonwealth of Massachusetts.

238.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the Commonwealth of Massachusetts,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

239.    The amounts of the false or fraudulent claims to the State of Massachusetts were material.

240.    Plaintiff Commonwealth of Massachusetts, being unaware of the falsity of the claims caused to be submitted by the Defendants and in reliance on the accuracy thereof, paid and continues to pay for adulterated drugs shipped by Defendants.

**COUNT EIGHTEEN**

**Violations of the Michigan Medicaid False Claims Act**
**(M.C.L.A. 400.601 *et seq.*)**

53

241.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Michigan under the *qui tam* provisions of the Michigan False Claims Act, M.C.L.A. 4000.601 *et seq.*

242.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Michigan.

243.    Through the acts described above and otherwise, Defendants knowingly caused to be presented for payment and approval to the Michigan Medicaid and/or Medicare programs, and continue to cause to be presented, false and fraudulent claims, directly or indirectly, to officers, employees or agents of the State of Michigan, in order to induce Medicaid and or Medicare to reimburse Medicaid or Medicare participating pharmaceutical providers for adulterated drugs when those claims were not and are not eligible for any such reimbursement.

244.    Through the acts described above and otherwise, Defendants knowingly caused to be made or used, and continue to cause to be used or made, false and fraudulent records and/or statements, in order to get claims for adulterated drugs allowed or paid by Medicaid and/or Medicare that were not eligible for any such reimbursement.

245.    Specifically, Defendants have:

•    caused thousands of false claims to be presented to the State of Michigan,

•    knowingly made, used or caused to be made or used false records to get false claims paid,

54

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

246. The amounts of the false or fraudulent claims caused to be made to the State of Michigan were material.

247. Plaintiff State of Michigan, unaware of the falsity of the claims caused to be presented by Defendants, and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims for adulterated drugs that would not have been paid or approved in any part if the truth were known.

248. By reason of Defendants' wrongful conduct, Michigan has suffered substantial financial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus the maximum allowable civil penalties for each such false statement caused to made or used by Defendants and each such false claim caused to be made by Defendants.

## COUNT NINETEEN

### Violations of Michigan Public Acts, 1977 PA 72, as amended by 1984 PA 333, as amended by 2005 PA 337, as amended by 2008 PA 421

249. Plaintiff realleges and incorporates by reference each and every of the foregoing paragraphs as if fully set forth herein.

250. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act brought by Plaintiff Stan Ellis on behalf of himself and the State of Michigan.

55

251.    By virtue of the acts described above, Defendants have violated the Michigan Medicaid False Claims Act.

252.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Michigan,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

253.    For example, claims for payment would not have been presented but for the concealment of their improper shipping methods by Defendants.  As a result of this illegal scheme, these claims were improper in whole pursuant to the State of Michigan's False Medicaid Claims Act.

254.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

255.    Each claim for payment related to the shipment of adulterated drugs into the State of Michigan represents a false or fraudulent record or statement.  Each claim for reimbursement submitted to a State-funded health insurance program represents a false or fraudulent claim for payment.

256.    Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false claims were presented over many years.

257.    The Michigan State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid and continues to

pay the claims that would not be paid had it known the truth about Defendants' defective shipping practices.

258. By reason of Defendants' acts, the Michigan State Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

259. The State of Michigan is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

260. Defendants did not, within a reasonable period of time after first obtaining information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

261. Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Michigan's False Claims Act on behalf of himself and the State of Michigan.

262. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

### COUNT TWENTY

**Minnesota False Claims Act**
**Minn. Stat. § 15C.01 *et seq.***

263. Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

264. This is a claim for treble damages and penalties under the Minnesota False Claims Act.

265. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

266. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

267. The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid had it known of Defendants' shipment of adulterated drugs.

268. By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

269. The State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-ONE

### Violations of the Montana False Claims Act
### 2005 Mont. Code, CH. 465, HB 146, *et seq*.

270. Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein. This Count is brought by Plaintiff-Relator Stan Ellis

in the name of the State of Montana under the *qui tam* provisions of the Montana False Claims Act, 2005 Mont. Code, CH. 465, HB 146, *et seq*.

271.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, adulterated pharmaceuticals into the State of Montana.

272.    The Montana False Claims Act, Mont. Code Ann., § 17-8-403 provides for liability for *inter alia* any person who engages in any or all of the following conduct:

(a)    knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;

(b)    knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;

(c)    conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity; . . .or

(h)    as a beneficiary of an inadvertent submission of a false claim to the governmental entity, subsequently discovering the falsity of the claim and failing to disclose the false claim to the governmental entity within a reasonable time after discovery of the false claim.

273.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Montana, for adulterated drugs.

274.    Specifically, Defendants have:

•    caused thousands of false claims to be presented to the State of Montana,

59

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

275.    The amounts of the false or fraudulent claims Defendants caused to be made to the State of Montana were material.

276.    Plaintiff State of Montana, being unaware of the falsity of the claims caused to be submitted by Defendants and in reliance on the accuracy thereof paid and may continue to pay for adulterated drugs.

277.    At all times relevant to the complaint, Defendants acted with the requisite knowledge.

278.    By virtue of the above-described acts, among others, Defendants knowingly engaged in conspiracies to defraud the Government of Montana by getting a false claim allowed or paid by the government for adulterated drugs.

279.    As a direct and proximate consequence of Defendants' conspiratorial conduct, the State of Montana has suffered significant, material financial damages in an amount to be proved at trial.

280.    The State of Montana would not have suffered these devastating losses had the truth about Defendants' actions been known.

## COUNT TWENTY-TWO

**Violations of the Nevada False Claims Act**
**Nevada Rev. Stat. §357.010 *et seq.***

281.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

282.    This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Nevada under the *qui tam* provisions of Nevada Rev. Stat. §357.010 *et seq.*, "Submission of False Claims to State or Local Government."

283.    Defendants, at all times relevant to this action, sold and shipped continue to sell and ship pharmaceuticals into the State of Nevada.

284.    Through the acts described above and otherwise, Defendants knowingly caused to be presented for payment and approval to the Nevada Medicaid program, possibly continues to cause to be presented, directly or indirectly, to officers, employees or agents of the State of Nevada, false and fraudulent claims in order to induce Medicaid reimbursement for pharmaceuticals that Defendants knew were adulterated and defective because of flash freezing that occurred during shipment to patients.

285.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Nevada,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; ; and,

- failed to disclose the existence of the false claims they have caused to be presented.

286.    At all times relevant and material to this Complaint, Defendants knowingly caused false claims for payment or approval for adulterated drugs to be presented to officers

and employees of the federal and state governments. As a result, the federal and state governments reimbursed Medicare and Medicaid provider pharmacies for ineligible claims for adulterated drugs, resulting in great financial loss to the Nevada government.

287. By virtue of the above-described acts, among others, Defendants knowingly caused to be made or used and continue to cause to be made or used false or fraudulent statements to get claims allowed or paid for adulterated drugs by the State of Nevada.

288. The amounts of the false or fraudulent claims and statements caused to be made by Defendants to the State of Nevada were material.

289. Plaintiff State of Nevada, being unaware of the falsity of the claims and/or statements caused to be made or used by Defendants, and in reliance on the accuracy thereof paid and continues to pay for Defendants' shipment of adulterated drugs.

## COUNT TWENTY-THREE
### Violations of the New Hampshire False Claims Act
### 167:61-b *et. Seq.*

290. Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein. This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of New Hampshire under the *qui tam* provisions of New Hampshire False Claims Act, 167:61-b *et. Seq.*

291. Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of New Hampshire.

292. Through the acts described above and otherwise, Defendants knowingly caused to be presented for payment and approval to the New Hampshire Medicaid and Medicare programs, and continue to cause to be presented, false and fraudulent claims, directly or indirectly, to officers, employees or agents of the State of New Hampshire, to

induce Medicaid and/or Medicare reimbursement for claims for adulterated drugs that were not and are not eligible for any such reimbursement.

293.   Through the acts described above and otherwise, Defendants knowingly caused to be made or used, and continue to cause to be made or used, false and fraudulent records and/or statements, in order to get claims for adulterated drugs allowed or paid by Medicaid and/or Medicare, that were not eligible for any such reimbursement.

294.   Specifically, Defendants have:

•      caused thousands of false claims to be presented to the State of New Hampshire,

•      knowingly made, used or caused to be made or used false records to get false claims paid,

•      conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

•      failed to disclose the existence of the false claims they have caused to be presented.

295.   The amounts of the false or fraudulent claims to the State of New Hampshire were material.

296.   Plaintiff State of New Hampshire, unaware of the falsity of the claims presented or caused to be presented by Defendants, and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims for Defendants' adulterated drugs that would not have been paid or approved in any part if the truth were known.

297.    By reason of Defendants' wrongful conduct, New Hampshire has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus the maximum penalties for each such false statement caused to be made or used by Defendants and each such false claim caused to be submitted by Defendants.

## COUNT TWENTY-FOUR

### Violations of the New Jersey False Claims Act, N.J. STAT. § 2A:32C-1

298.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

299.    This is a *qui tam* action brought by brought by Relator Stan Ellis and the State of New Jersey to recover treble damages, civil penalties and the cost of this action, under the New Jersey False Claims Act.

300.    Defendants have engaged in a continuous practice of using defective shipping methods to send temperature sensitive biologics drugs to patients, with the result that they have: (a) knowingly presented and caused to be presented, to an officer and employee of the State of New Jersey, false and fraudulent claims for payment and approval; and (b) knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of New Jersey.

301.    The New Jersey False Claim Act prohibits any person from:

(1) Knowingly presenting, or causing to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval;

(2) Knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) Conspiring to defraud the state by getting a false or fraudulent claim allowed or paid;

302. Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment under the New Jersey Medicaid program, claims which failed to disclose the material violations of the New Jersey False Claims Act.

303. Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment under the New Jersey Medicaid program, claims which failed to disclose the material violations of the New Jersey False Claims Act.

304. Specifically, Defendants have:

- Caused thousands of false claims to be presented to the State of New Jersey,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

305. For example, prescriptions would not have been presented for payment but for the illegal concealment of the adulteration of drugs shipped by Defendants to New

65

Jersey patients. As a result of this illegal scheme, these claims were improper in whole pursuant to the State of New Jersey False Claims Act.

306. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims.

307. Each claims for payment for adulterated drugs shipped to New Jersey patients represents a false or fraudulent record or statement. Each claim for reimbursement for such prescriptions submitted to a State-funded health insurance program represents a false or fraudulent claim for payment.

308. Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims occurred in the shipment of several drugs and occurred over many years.

309. The New Jersey State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal concealment of their defective shipping methods that resulted in the adulteration of drugs it shipped.

310. By reason of Defendants' acts, the New Jersey Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

311. New Jersey is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

312. Defendants did not, within a reasonable period of time after first obtaining information as to such violations, furnish such information to officials of the State

66

responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

313.    Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to the New Jersey False Claims Act on behalf of himself and the State of New Jersey.

314.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

## COUNT TWENTY-FIVE

### Violations of the New Mexico Medicaid False Claims Act, N.M. Stat ANN. §27-14-1 et *seq.*

315.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of New Mexico under the *qui tam* provisions of the New Mexico Medicaid False Claims Act §27-14-1 *et seq.*

316.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of New Mexico.

317.    Through the acts described above and otherwise, Defendants knowingly caused to be presented for payment and approval to the New Mexico Medicaid and/or Medicare programs, and continue to cause to be presented, false and fraudulent claims directly or indirectly, to officers, employees or agents of the State of New Mexico, in order

67

to induce Medicaid and/or Medicare reimbursement for claims for adulterated drugs that were not eligible for any such reimbursement.

318.    Through the acts described above and otherwise, Defendants knowingly caused to be made or used, and continue to cause to be made or used, false and fraudulent records and/or statements, in order to get claims for adulterated drugs allowed or paid by Medicaid and Medicare that were not eligible for any such reimbursement.

319.    Specifically, Defendants have:

•    caused thousands of false claims to be presented to the State of New Mexico,

•    knowingly made, used or caused to be made or used false records to get false claims paid,

•    conspired to defraud the state by getting false and fraudulent claims allowed or paid; ; and,

•    failed to disclose the existence of the false claims they have caused to be presented.

320.    The amounts of the false or fraudulent claims caused to be made to the State of New Mexico were material.

321.    Plaintiff State of New Mexico, unaware of the falsity of the claims presented or caused to be presented by Defendants, and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims for adulterated drugs that would not have been paid or approved in any part if the truth were known.

322.    By reason of Defendants' wrongful conduct, New Mexico has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple

damages under the False Claims Act, to be determined at trial, plus the maximum civil penalty allowed under the state law for each such false claim caused to be submitted by Defendants and each such false statement caused to be made or used by Defendants.

### COUNT TWENTY-SIX

**Violations of the New Mexico Fraud Against Taxpayers Act
N.M. Stat. § 44-9-1 *et seq*.**

323.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

324.    This is a *qui tam* action brought by Relator-Plaintiff Stan Ellis on behalf of the State of New Mexico to recover treble damages, civil penalties and the cost of the civil action under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1.

325.    N.M. Stat. Ann. § 44-9-3 (A) of the New Mexico Fraud Against Taxpayers Act provides that [a] person shall not:

(1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee or this recipient of state funds a false or fraudulent claim for payment or approval;

(2) knowingly make or use, or cause to be made or used, a false record or statement to obtain approval or payment on a false or fraudulent claim;

(3) conspire to defraud the state by obtaining approval or payment on a false claim;

(9) as a beneficiary of an inadvertent submission of a false claim and having subsequently discovered the falsity of the claim, fail to disclose the false claim to the state agency within a reasonable time after discovery.

326.    Pursuant to N.M. Stat. Ann. § 44-9-3(B) of the New Mexico Fraud Against

Taxpayers Act, proof of specific intent is not required for a violation of subsection A of Section 3.

327.    Defendants at all times relevant to this action, sold and shipped and continue to sell and ship pharmaceuticals into the State of New Mexico.

328.    By virtue of the illegal conduct and the other misconduct alleged herein, including causing the submissions of non-reimbursable claims for adulterated prescription drugs described above and using or causing to be used false or fraudulent records to accomplish this purpose, Defendants violated N.M. Stat. Ann. § 44-9-3(A) of the New Mexico Fraud Against Taxpayers Act with the requisite intent.

329.    Specifically, Defendants have:

•    caused thousands of false claims to be presented to the State of New Mexico,

•    knowingly made, used or caused to be made or used false records to get false claims paid,

•    conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

•    failed to disclose the existence of the false claims they have caused to be presented.

330.    For example, claims for reimbursement for the sale and shipment of adulterated drugs prescribed to government-funded health care program beneficiaries would not have been submitted to the State of New Mexico but for the illegal practices of Defendants described in this Complaint.

331.     The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

332.     By reason of these improper payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

333.     Defendants did not, within a reasonable period of time after first obtaining information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

334.     Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to N.M. Stat. Ann. § 44-9-5 of the New Mexico Fraud Against Taxpayers Act on behalf of himself and the State of New Mexico.

335.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

## COUNT TWENTY-SEVEN

### Violations of the New York False Claims Act
### State Finance Law, §187 *et seq*.

336.     Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis

71

in the name of the State of New York under the *qui tam* provisions of the New York False Claims Act, N.Y. St. Fin. §187 *et seq*.

337. Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals in the State of New York.

338. The New York False Claims Act, State Fin. Law § 189 specifically provides, in part, that a person commits an unlawful act if the person:

(a) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government;

(c) conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid;

339. Through the acts described above and otherwise, Defendants knowingly caused to be presented for payment and approval to the New York Medicaid and/or Medicare programs, and continue to cause to be presented, false and fraudulent claims, directly or indirectly, to officers, employees or agents of the State of New York, in order to induce Medicaid and or Medicare to reimburse Medicaid or Medicare participating pharmaceutical providers for adulterated drugs when those claims were not and are not eligible for any such reimbursement.

340. Through the acts described above and otherwise, Defendants knowingly caused to be made or used, and continue to cause to be used or made, false and fraudulent records and/or statements, in order to get claims for adulterated drugs allowed or paid by Medicaid and/or Medicare that were not eligible for any such reimbursement.

72

341.    Specifically, Defendants have:

• caused thousands of false claims to be presented to the State of New York,

• knowingly made, used or caused to be made or used false records to get false claims paid,

• conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

• failed to disclose the existence of the false claims they have caused to be presented.

342.    The amounts of the false or fraudulent claims to the State of New York were material.

343.    Plaintiff State of New York, unaware of the falsity of the claims caused to be presented by Defendants, and in reliance on the accuracy thereof, have paid and approved, and continue to pay and approve, claims for adulterated drugs that would not have been paid or approved in any part if the truth were known.

344.    By reason of Defendants' wrongful conduct, New York has suffered substantial financial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus the maximum allowable civil penalties for each such false statement caused to made or used by Defendants and each such false claim caused to be made by Defendants.

## COUNT TWENTY-EIGHT

### North Carolina False Claims Act
### N.C. Gen. Stat. §§1-605 *et seq.*

345. Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

346. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

347. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

348. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

349. By virtue of the acts described above, Defendants conspired with others to defraud North Carolina by inducing the North Carolina State Government to pay or approve false or fraudulent claims.

350. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' concealment of their shipment of adulterated drugs to patients in North Carolina.

351. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

352. The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-NINE

### Violations of the Oklahoma Medicaid False Claims Act,
### 63 Okla. Stat. § 5053, *et seq.*

353.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

354.    This is a *qui tam* action brought by brought by Plaintiff-Relator Stan Ellis and the State of Oklahoma to recover treble damages, civil penalties and the cost of this action, under the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053, *et. seq.*

355.    Defendants have engaged in a continuous practice of using deficient shipping methods of temperature sensitive biologics pharmaceuticals, with the result that they have: (a) knowingly presented and caused to be presented, to an officer and employee of the State of Oklahoma, false and fraudulent claims for payment and approval; and (b) have knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Oklahoma.

356.    The Oklahoma Medicaid False Claims Act, 63 Okla. Stat. § 5053.1 (B), specifically provides in part:

(B) Any person who:

(1) knowingly presenting or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the state; and,

(3) conspires to defraud the state by getting a false claim allowed or paid by the governmental entity; …

75

Is liable to the State of Oklahoma for a civil penalty of not less than $ 5,000.00 and not more than $10,000.00, … plus three times the amount of damages which the state sustains because of the act of that person.

357.    Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment under the Oklahoma Medicaid program, claims which failed to disclose the material violations of the Oklahoma Medicaid False Claims Act.

358.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Oklahoma,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

359.    For example, claims for payment for adulterated drugs would not have been presented but for the concealment of known deficient shipping methods for pharmaceuticals by Defendants.  As a result of this illegal scheme, these claims were improper in whole pursuant to the State of Oklahoma State False Medicaid Claims Act.

360.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the State of Oklahoma to approve and pay such false and fraudulent claims.

361. Each claim for payment for an adulterated drug as a result of Defendants' deficient shipping practices represents a false or fraudulent record or statement. Each claim for reimbursement for such shipment of adulterated drugs submitted to a State-funded health insurance program represents a false or fraudulent claim for payment.

362. Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented for several medications and occurred over many years.

363. The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' concealment of their known shipment of adulterated drugs.

364. By reason of Defendants' acts, the Oklahoma State Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

365. Oklahoma is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

366. Defendants did not, within a reasonable period of time after first obtaining information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

367. Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Oklahoma False Medicaid Claims Act on behalf of himself and the State of Oklahoma.

368. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

## COUNT THIRTY

### Violations of the Rhode Island False Claims Act,
### R.I. Gen. Laws § 9-1.1-1, *et seq.*

369. Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

370. This is a *qui tam* action brought by brought by Relator Stan Ellis and the State of Rhode Island to recover treble damages, civil penalties and the cost of this action, under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1, *et. seq.*

371. Defendants have engaged in a continuous practice of concealing known problems with their methods of shipping temperature sensitive biologics drugs, with the result that they have: (a) knowingly presented and caused to be presented, to an officer and employee of the State of Rhode Island, false and fraudulent claims for payment and approval; and (b) knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Rhode Island.

372. The Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-3(a), specifically provides in part:

78

(a) Any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; … is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the state for the costs of a civil action brought to recover any such penalty or damages.

373.    Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment for adulterated drugs under the Rhode Island Medicaid program, claims which failed to disclose the material violations of the Rhode Island False Claims Act.

374.    Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment under the Rhode Island Medicaid program, claims which failed to disclose the material violations of the Rhode Island False Claims Act.

375.    Specifically, Defendants have:

• caused thousands of false claims to be presented to the State of Rhode Island,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

376. For example, payment for adulterated drugs shipped by Defendants would not have been made but for the concealment of known problems with their shipping methods by Defendants. As a result of this illegal scheme, these claims were improper in whole, pursuant to the State of Rhode Island False Claims Act.

377. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Rhode Island state government to approve and pay such false and fraudulent claims.

378. Each claim for payment as a result of Defendants' sale and shipment of adulterated drugs represents a false or fraudulent record or statement. Each claim for reimbursement for such shipment of adulterated drugs submitted to a State-funded health insurance program represents a false or fraudulent claim for payment.

379. Plaintiff cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented for sale and shipment of several medications and occurred over many years.

380. The Rhode Island State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendants, paid and continues to

pay the claims that would not be paid but for Defendants' concealment of known problems with their shipping methods.

381. By reason of Defendants' acts, the Rhode Island State Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

382. Rhode Island is entitled to the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

383. Defendants did not, within a reasonable period of time after first obtaining information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

384. Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of himself and the State of Rhode Island.

385. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

## COUNT THIRTY-ONE

**Violations of the Tennessee Medicaid False Claims Act**
**Tenn. Stat. §§75-1-181 *et seq.***

81

386.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

387.    This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Tennessee under the *qui tam* provisions of the Tennessee Medicaid False Claims Act, Tenn. Stat. §§75-1-181 *et seq.*

388.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Tennessee.

389.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Tennessee, for adulterated drugs.

390.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Tennessee,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

391.    The amounts of the false or fraudulent claims to the State of Tennessee were material.

392.    Plaintiff State of Tennessee, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants, and in reliance on the accuracy

thereof paid and may continue to pay for Defendants' sale and shipment of adulterated drugs to Tennessee patients.

## COUNT THIRTY-TWO

### Violations of the Tennessee False Claims Act
### Tenn. Code Ann. § 4-18-101 *et seq.*

393.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.

394.    This is a qui tam action brought by Plaintiff Stan Ellis on behalf of the State of Tennessee to recover treble damages, civil penalties and the cost of the civil action under the *qui tam* provisions of the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.*

395.    Tenn. Code Ann. §4-18-103, titled "Liability for violations," provides:

(a) Any person who commits any of the following acts shall be liable to the state or to the political subdivision for three (3) times the amount of damages which the state or the political subdivision sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than two thousand five hundred dollars ($ 2,500) and not more than ten thousand dollars ($ 10,000) for each false claim:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

396.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the State of Tennessee,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

397.    The State of Tennessee, by and through Tennessee-funded health plans, and unaware of Defendants' illegal practices, paid the claims submitted by health care providers and third party payors in connection therewith.

398.    Had the State of Tennessee known that Defendants had shipped and sold adulterated drugs in violation of the federal and state laws cited herein, it would not have paid the claims submitted by health care providers in connection with Defendants' fraudulent and illegal practices.

399.    As a result of Defendants' violations of Tenn. Code Ann. §§4-18-103, the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive on interest.

400.    Relator Stan Ellis is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Tenn. Code Ann. §§4-18-103 on behalf of himself and the State of Tennessee.

401.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

## COUNT THIRTY-THREE

### Violations of the Texas Medicaid Fraud Prevention Act
### Tx. Human Resources Code, Ch. 36, §36.101 *et seq.*

402.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis in the name of the State of Texas under the *qui tam* provisions of the Texas Medicaid Fraud Prevention Act, Tx. Human Resources Code, Ch. 36, §36.101 *et seq.*

85

403.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the State of Texas.

404.    Specifically, Defendants have caused thousands of false claims to be presented to the State of Texas and:

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

405.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the State of Texas, for adulterated drugs.

406.    The amounts of the false or fraudulent claims to the State of Texas were material.

407.    Plaintiff State of Texas, being unaware of the falsity of the claims caused to be submitted by the Defendants, and in reliance on the accuracy thereof paid and continues to pay for Defendants' adulterated drugs sold in and shipped to Texas.

## COUNT THIRTY-FOUR

### Vermont False Claims Act

### 32 V.S.A §§ 630-642 *et seq.*

408.    Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

409.     This is a claim for treble damages and penalties under the Vermont False Claims Act.

410.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

411.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

412.     The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims for the sale or shipment of adulterated drugs that would not be paid but for Defendants' illegal concealment of their deficient shipping practices.

413.     By reason of the Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

414.     The State of Vermont is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTY-FIVE

### Violations of the Virginia Fraud Against Taxpayers Act
### Va. Stat. Ch. 842, Article 19.1, § 8.01-216.1 *et seq.*

415.     Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs as if fully set forth herein.  This Count is brought by Plaintiff-Relator Stan Ellis

87

in the name of the Commonwealth of Virginia under the *qui tam* provisions of the Virginia Fraud Against Taxpayers Act, Va. Stat. Ch. 842, Article 19.1, § 8.01-216.1 *et seq.*

416.    Defendants at all times relevant to this action sold and shipped, and continue to sell and ship, pharmaceuticals into the Commonwealth of Virginia.

417.    By virtue of the above-described acts, among others, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the Commonwealth of Virginia, for adulterated drugs sold in or shipped to Virginia.

418.    Specifically, Defendants have:

- caused thousands of false claims to be presented to the Commonwealth of Virginia,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims they have caused to be presented.

419.    The amounts of the false or fraudulent claims to the Commonwealth of Virginia were material.

420.    Plaintiff Commonwealth of Virginia, being unaware of the falsity of the claims caused to be submitted by the Defendants, and in reliance on the accuracy thereof paid and continues to pay for Defendants' adulterated drugs sold in or shipped to Virginia.

## COUNT THIRTY-SIX

### Washington Medicaid Fraud False Claims Act

### West's RCWA 43.131.0001 *et seq.*

421.	Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

422.	This is a claim for treble damages and penalties under the Washington Medicaid False Claims Act.

423.	By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

424.	By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

425.	The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims for the sale or shipment of adulterated drugs that would not be paid but for Defendants' illegal concealment of their deficient shipping practices.

426.	By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

427.    The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTY-SEVEN

### New York City False Claims Act
### New York City Administrative Code §7-801-§7-810

428.    Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

429.    This is a claim for treble damages and penalties against Defendants on behalf of the City of New York under the New York City False Claims Act, New York City Administrative Code §7-801-§7-810.

430.    By virtue of the above-described acts, among others, Defendants knowingly and willfully concealed the known health risks associated with their shipment of adulterated drugs.

431.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for payment for adulterated drugs to the New York City Government.

432.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York City Government to approve and pay such false and fraudulent claims.

433.    The New York City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

90

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements and/or business practices.

434.    By reason of the Defendants' unlawful acts, the City of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

WHEREFORE, Plaintiff Ellis demands judgment against Defendants as follows:

a.    That by reason of the aforementioned violations of the New York City False Claims Act provisions that this Court enter judgment in Plaintiff's favor and against Defendants in an amount equal to not less than two times and not more than three times the amount of damages that the City of New York has sustained because of defendants' actions, plus a civil penalty of not less than $5,000 and not more than $15,000 for each violation of the New York City False Claims Act, New York City Administrative Code §7-801-§7-810;

b.    That Relator, as *Qui Tam* Plaintiff, be awarded the maximum amount allowed pursuant New York City Administrative Code § 704(i) and/or any other applicable provision of law;

c.    That Relator be awarded all costs and expenses of this action, including attorney's fees and court costs incurred in the prosecution of this suit; and

d.    That Plaintiff and Relator have such other and further relief that this Court deems just and proper.

## COUNT THIRTY-EIGHT

### City of Chicago False Claims Act
### Municipal Code of Chicago §1-22-010-§1-22-060

435.    Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

91

436.    This is a claim for treble damages and penalties against Defendants on behalf of the City of Chicago under the Chicago False Claims Act, Municipal Code of Chicago §1-22-010-§1-22-060.

437.    By virtue of the above-described acts, among others, Defendants knowingly and willfully concealed known health risks associated with their defective shipping practices that result in the shipment of adulterated and potentially dangerous drugs.

438.    By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims for drugs to the City of Chicago.

439.    By virtue of the above-described acts, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the City of Chicago to approve and pay such false and fraudulent claims.

440.    The Chicago City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal business practices.

441.    By reason of the Defendants' unlawful acts, the City of Chicago has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## **COUNT THIRTY-NINE**

**Violations of 19 Phila. Code § 3600, et seq.**

**Knowingly presents or causes to be presented to an officer or employee a false claim for payment or approval.**

442.    Plaintiff-Relator Stan Ellis and the City of Philadelphia re-allege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

443.    This is a qui tam action brought by Plaintiff-Relator Stan Ellis and the City of Philadelphia to recover treble damages, civil penalties, the cost of this action, and their attorney's fees under the City of Philadelphia's False Claims Act.

444.    The City of Philadelphia's False Claims Act, 19 Phila. Code § 3602(1), provides that a City contractor can be held liable if it "[k]nowingly presents or causes to be presented to an officer or employee a false claim for payment or approval."

445.    By virtue of the above-described acts, Defendants knowingly presented or caused to be presented false claims for approval.

446.    The amount of the false claims to the City was material.  Plaintiff City of Philadelphia was unaware of the falsity of the claims, and in reliance on the accuracy thereof, approved and continues to approve the unlawful payment of claims for adulterated drugs.

447.    The City of Philadelphia has suffered substantial losses as a result of Defendants' violations of 19 Phila. Code § 3602(1) in an amount that exceeds hundreds of thousands of dollars, and is entitled to treble damages under the False Claims Act, plus relevant civil fines, penalties, costs of suit, and attorney's fees in conformity with the City of Philadelphia's False Claims Act, to be determined at trial.

## COUNT FORTY

**Violations of Allegheny County Code of Ordinances Chapter 485**

**Knowingly presents or causes to be presented to an officer or employee a**

93

**false claim for payment or approval.**

448.   Plaintiff-Relator Stan Ellis and Allegheny County, Pennsylvania re-allege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

449.   This is a qui tam action brought by Plaintiff-Relator Stan Ellis and Allegheny County, Pennsylvania to recover treble damages, civil penalties, the cost of this action, and their attorney's fees under the Allegheny County False Claims Ordinance.

450.   The Allegheny County False Claims Ordinance, Allegheny County Code of Ordinances, Chapter 485-Section 2(A) provides that any person who "knowingly presents or causes to be presented to an officer or employee of the County a false claim for payment or approval" shall be "liable to the County for three times the amount of damages which the County sustains because of such action, and shall be liable for attorneys' fees and costs for any civil action brought to recover such damages and penalties.

451.   By virtue of the above-described acts, Defendants knowingly presented or caused to be presented false claims for approval.

452.   The amount of the false claims to Allegheny County was material. Plaintiff Allegheny County was unaware of the falsity of the claims, and in reliance on the accuracy thereof, approved and continues to approve the unlawful payment of claims for adulterated drugs.

453.   Allegheny County has suffered substantial losses as a result of Defendants' violations of the False Claims Ordinance in an amount that exceeds hundreds of thousands of dollars, and is entitled to treble damages under the False Claims

94

Ordinance, plus relevant civil fines, penalties, costs of suit, and attorney's fees in conformity with the Allegheny County False Claims Ordinance, to be determined at trial.

## JURY DEMAND

454.    Plaintiff demands trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Relator Stan Ellis, on behalf of himself, the United States of America and the Plaintiff States, demands and prays that judgment be entered as follows against the Defendants under the Federal FCA Counts and under supplemental FCA counts of the Plaintiff States as follows:

(a)    In favor of the United States against Defendants for treble the amount of damages to Government Health Care Programs (Medicaid, Medicare, Medicare Part D, the Railroad Retirement Medicare Program, Federal Employees Health Benefit Programs, Tri-Care (formerly CHAMPUS), CHAMPVA, State Legal Immigrant Assistance Grants and the Indian Health Service) for the shipping of adulterated drugs alleged herein, plus the maximum civil penalties of $11,000 (plus interest) for each false claim caused to be submitted, for each false record submitted or caused to be submitted and each false claim caused to be submitted by Defendants' conspiracy to submit false claims;

(b)    In favor of the United States against the Defendants for disgorgement of the profits earned by Defendants as a result of their illegal scheme;

(c)    In favor of Plaintiff-Relator Stan Ellis for the maximum amount allowed pursuant to 31 U.S.C. §3730(d) to include reasonable expenses, attorneys fees and costs incurred by Plaintiff-Relator Stan Ellis;

(d)    For all costs of the Federal FCA civil action;

(e)      In favor of the Plaintiff-Relator Stan Ellis and the United States for such other relief as this Court deems just and equitable;

(f)      In favor of the Plaintiff-Relator Stan Ellis and the named State Plaintiffs against Defendants in an amount equal to three times the amount of damages that the named Plaintiff States have sustained as a result of the Defendants' actions, as well as the statutory maximum penalty against the Defendants for each violation of each State's FCA;

(g)      In favor of Plaintiff-Relator Stan Ellis for the maximum amount allowed as Relator's share pursuant to the Plaintiff State FCAs as follows: the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175, *et seq.*, the California False Claims Act, Cal. Gov. Code §12651(a), the Delaware False Claims and Reporting Act, Del. Stat. Tit. VI. §1201, *et seq.,* the District of Columbia False Claims Act, D.C. Stat. §2-308.03 *et seq.*, the Florida False Claims Act, Fl. Stat. §§68.081-68.09, *et seq.,* the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 *et seq.,* the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §439, *et seq.,* Massachusetts False Claims Act, Mass. Gen. Laws c.12 §5(A), *et seq.,* the Michigan Medicaid False Claims Act, M.C.L.A. 400.601 *et seq.;* Michigan Public Acts, 1977 PA 72, as amended by 1984 PA 333, as amended by 2005 PA 337, as amended by 2008 PA 421; the Montana False Claims Act, 2005 Mont. Code, CH. 465, HB 146, *et seq.*, the Nevada False Claims Act, Nevada Rev. Stat. §357.010 *et seq.*, the New Hampshire False Claims Act, 167:61-b *et seq.*, the New Mexico False Claims Act, N.M. Stat ANN. §27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act , N.M. Stat. § 44-9-1 *et seq.*; the New York False Claims Act, State Finance Law, §187 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Stat. §§75-1-181 *et seq.*; the Tennessee False Claims Act Tenn. Code Ann. § 4-18-101 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tx.

Human Resources Code, Ch. 36, §36.101 *et seq.*, Indiana False Claims and Whistleblower Act, IC 5-11-5.5 *et seq.*, Georgia State False Medicaid Claims Act, Ga. Code 49-4-168 *et seq.,* and the Virginia Fraud Against Taxpayers Act, Va. Stat. Ch. 842, Article 19.1, §8.01-216.1 *et seq.;* New Jersey False Claims Act, N.J. STAT. § 2A:32C-1; Oklahoma Medicaid False Claims Act,  63 Okla. Stat.  § 5053, *et seq.*; and the Rhode Island False Claims Act, R.I. Gen. Laws  § 9-1.1-1, *et seq.*; and the Vermont False Claims Act, 32 V.S.A. §§ 630-642 *et seq.*; plus interest;

(h)     In favor of Plaintiff- Relator Stan Ellis for all costs and expenses associated with the supplemental claims of the Plaintiff States, including attorney's fees and costs;

(i)     In favor of the Plaintiff States and Plaintiff-Relator Stan Ellis for all such other relief as the Court deems just and proper; and,

(j)     In the event that the United States or Plaintiff States proceed with this action, Plaintiff-Relator Stan Ellis, be awarded an appropriate amount for disclosing evidence or information that the United States and/or the Plaintiff States did not possess when this action was brought to the government.  The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim.  The amount awarded to Plaintiff-Relator also includes the results of government actions or settlement of claims resulting from the expansion of claims through the government's further investigation directly generated from or attributable to Plaintiff-Relator's information; and

(k)     Such other relief as this Court deems just and appropriate.

97

Respectfully Submitted,

**McCAFFERTY LAW FIRM, LLC**

**/s/ Brian P. McCafferty**

_____

| | |
|---|---|
| Michael Hamilton (admitted pro hac vice) | Brian P. McCafferty |
| Patrick Barrett (admitted pro hac vice) | 117 Swamp Road |
| **PROVOST UMPHREY** | Newtown, PA  18940 |
| **LAW FIRM, LLP** | Tel.: 267-872-0852 |
| Hobbs Building, Suite 303 | cafstar@aol.com |
| 4205 Hillsboro Pike, #303 | |
| Nashville, TN 37215 | William H. Narwold (admitted pro hac vice) |
| Tel.:  615-297-1932 | Mathew P. Jasinski (admitted pro hac vice) |
| mhamilton@pulf.com | Michael J. Pendell (admitted pro hac vice) |
| pbarrett@pulf.com | **MOTLEY RICE LLC** |
| | 20 Church Street, 17th Floor |
| Guy Fisher (admitted pro hac vice) | Hartford, CT 06103 |
| **PROVOST UMPHREY** | Tel.: (860) 882-1681 |
| **LAW FIRM, LLP** | bnarwold@motleyrice.com |
| 350 Pine Street, Suite 1100 | mjasinski@motleyrice.com |
| Beaumont, TX 77701 | mpendell@motleyrice.com |
| Tel.: (409) 835-6000 | |
| gfisher@pulf.com | **Attorneys for Plaintiff-Relator Stan Ellis** |

Dated: October 11, 2023

98