**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STAN ELLIS** *et al.* | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 16-1582**[1] |
| | : | |
| **CVS HEALTH CORPORATION** *et al.* | : | |

**McHUGH, J.**                                                                                    **June 22, 2026**

### MEMORANDUM (redacted)

This is a *qui tam* action in which relator Stan Ellis advances the proposition that certain medications paid for by the federal government may have been worthless because of problems encountered in transit. The record supports a conclusion that the drugs in question, known as biologics, present inherent challenges during shipping, and that Defendant CVS Health Corporation was concerned about whether their shipping methods were sufficient to meet those challenges and preserve the medications. But the False Claims Act requires that there be a false claim, which in this case would require proof the medications paid for by the government were medically worthless. Despite voluminous discovery, Ellis lacks such direct proof. To compensate, he seeks to establish worthlessness by arguing that the medications were so systemically vulnerable, and shipping methods used by CVS were so utterly deficient that the medications can be presumed compromised, or, at a minimum, deemed unmarketable. But the False Claims Act is rooted in the concept of fraud, and Ellis' novel alternative theories would take the concept of worthless services to an untenable extreme, finding medical worthlessness with no evidence that

---

[1] The United States spent almost 6 years investigating before declining intervention.  ECF 20.

any drug's efficacy was impaired in any way. I will therefore grant the pending motion for summary judgment and dismiss this case.

## I.    Background

### A. Factual history

In the early 2010s, CVS Health and its subsidiary pharmacies[2] developed concern over whether their shipping methods were freezing sensitive prescription drugs, impacting their efficacy. These drugs are generally known as "biologics" because they are made of complex protein structures developed in living cells. *See* Ex. 4, Osial Report ¶ 20.[3] The drugs' chemical structure, and thus their medical value, can degrade if they leave their necessary storage temperature for too long. Ex. 82, American College of Rheumatology Position Stmt., at 2-3. Such a "short-term exposure to heat and cold" is known as an "excursion." Ex. 72, 32 U.S.P., 27 Nat'l Formulary § 1079 at 538 (2009). There are two authoritative guides to pharmacy practice, the United States Pharmacopeia (USP), a standard-setting body which issues and periodically updates standards and practices, and a companion reference work, the National Formulary (NF), which are now issued as a set.[4] the authoritative guide to pharmacy practice. Multiple editions of the USP

---

[2] In this Motion, CVS seeks to distinguish CVS Health from its subsidiarity pharmacies, arguing that CVS Health employs no workers and has never shipped a single drug. *See* Defs.' Br. at 47-49, ECF 184. In this memorandum, I will refer to "CVS" as a singular entity for ease of reference, because any distinctions are irrelevant to my conclusions in this Motion, and because I previously held Ellis stated a claim against CVS Health. *See* Mot. to Dismiss Memo. at 5-6, ECF 47.

[3] One of the drugs at issue, Copaxone, is not technically a biologic but is "functionally the same as a biologic even though its proteins are synthesized." Ex. 130, Wong Report ¶ 19. The parties attach no significance to this distinction, so nor will the Court.

[4] The *USP–NF* is a combination of two compendia, the *United States Pharmacopeia* (USP) and the *National Formulary* (*NF*). It contains standards for medicines, dosage forms, drug substances, excipients, biologics, compounded preparations, medical devices, dietary supplements, and other therapeutics." S*ee* https://www.uspnf.com/purchase-usp-nf (last visited May 29, 2026) .

guide have included detailed subheadings about how to prevent temperature excursions in the handling and shipping of sensitive drugs, and, when they happen, how to measure their effect and advise patients. *See generally* Exs. 19, 72, 143, & 144. (excerpts from various USP guide editions).

One basic practice is making sure drugs stay in the storage temperatures listed on drugs' FDA-approved labels. *See* Ex. 6-1, Lin[5] Opening Rpt. ¶ 32; Ex. 9, Amgen Dep., at 34:15–20. Meanwhile, the target temperatures themselves come from "stability studies," which measure drugs' sensitivity to changes in temperature. *See* Ex. 19, U.S.P. 36, Nat'l Formulary 31 § 1079 at 695 (2013); Ex. 6-1, Lin Opening Rpt. ¶¶ 4-48. These studies tend to be commissioned by manufacturers, *see* Ex. 18, Abato[6] Dep., at 66:15–67:23, and can serve as reference tools for pharmacists. *See, e.g.*, Ex. 14, Wong[7] Dep. a 70:4–10, 116:21-117:7.

All these tools for measuring stability and preventing excursions enable pharmacies to deliver temperature-sensitive drugs to patients' homes. *See* Ex. 2, Solomon[8] Rpt. ¶ 51. They do so through "cold-chain" shipping, which uses modern refrigeration, insulation, and supply chains to deliver temperature-sensitive drugs to patients, including those for whom recurring provider visits are inconvenient or impossible. *See id.* ¶ 52; Ex. 21, DiMauro Dep. at 137:4–20. Although cold-chain shipping entails an "inherent" risk of excursions, "not every temperature excursion will necessarily affect the stability of a medication." Ex. 13, Molina Dep.[9] at 43:5–44:13. Still,

---

[5] Dr. Lin is a defense expert on FDA standards.

[6] Dr. Abato is Plaintiff's expert in chemistry who has experience in the pharmaceutical industry.

[7] Dr. Wong is Plaintiff's expert on pharmaceutical practice.

[8] Dr. Solomon is a defense expert in neurology with a focus on auto-immune disease, for which biologics delivered to a patient's home are an important therapy.

[9] Dr. Molina is Plaintiff's expert on temperature-controlled packaging design.

pharmacists strive to maintain the FDA-approved storage temperature throughout a drug's life cycle, including during shipping. *See* Ex. 130, Wong Report. ¶ 38-39. As a CVS pharmacist testified, "you have to ship it under conditions that will keep the product cool until it gets to the patient." Ex. 150, Black Dep. at 39:23-25.

To avoid excursions, pharmacies sometimes test the "packouts"—the combination of gel freeze-packs, other insulation, and container material—that they use to ship drugs. *See, e.g.*, Ex. 38, Klecha Dep., at 19:14–18. CVS's main packout during the time relevant to this case was known as an "EPS Packout," because its outer shell is made of Expanded Polystyrene Styrofoam. *See* Ex. 152, Janssens Dep. at 88:15-24. In 2008, CVS's subsidiary Caremark hired an outside testing company to test a variety of EPS packouts and identify those that would best keep drugs at 2-8 °C. *See generally* Exs. 41-43 (communications and reports from Caremark's search for new packouts). In January 2009, they chose one of the EPS packouts which passed that testing. *See* Ex. 45 at 120396. By 2011, those EPS packouts were used by other CVS-affiliated pharmacies. *See* Ex. 46 at 0018968 to -71.

But CVS identified a problem in that some drugs in the EPS packouts were "flash-freezing" during shipment. *See, e.g.*, Ex. 92; Ex. 105; Ex. 114; Ex. 116. (CVS decisionmakers discussing the "flash freezing problem"). "Flash-freezing" refers to rapid declines in temperature below 0 °C. Ex. 154, Zimmerly Dep. at 169:11-171:4. CVS's internal customer service tracking system revealed at least ten times where one of the temperature-sensitive drugs at issue in this case arrived at patients' homes frozen. *See generally* Ex. 129, Service Event Tracker. When that happened, CVS developed a policy of offering free replacements for any drugs that patients reported had experienced an excursion. *Id.*; *see also* Ex. 155, Underkoffler Dep. at 28:14-21.

Around the same time, a third-party lab tested substantially similar packouts, observing repeated flash-freezing despite multiple rounds of tinkering with the temperature and warming time of the gel freeze packs.  *See* Ex. 106, Klecha Email.  Another third-party lab found the same results—the EPS packout saw flash-freezing repeatedly.  *See generally* Exs. 109A & 109B (summarizing multiple rounds of test results).  Not all the results were concerning. For example, a 2011 re-test funded by CVS found the packouts preserved the 2-8 temperature range.  *See generally* Exs. 49, 51 (showing results from two 2011 tests).[10]   But in 2012 CVS executives privately admitted they had a "flash freezing problem." Ex. 154, Zimmerly Dep. at 139:20-22. This led the company to request proposals for a new Packout design.  *See* Ex. 54 at 26491-92.

Relator Stan Ellis was a salesman for Coldkeepers, a company selling cold-chain packaging supplies.  *See id.*  CVS tested Coldkeepers' packout in comparison to their other EPS packouts. *See* Ex. 55 , and in  2013  awarded a contract to Coldkeepers.  *See* Ex. 56, 0120922 to -27.

That deal proved short-lived and mutually unsatisfying, with both sides blaming the other for failing to perform their end of the bargain.[11]  Less than a year after signing with Coldkeepers, CVS ended the relationship.  *See* Ex. 153, Saad Dep. at 133:7-17. This lawsuit followed in 2016.

### B. Procedural History

In the Amended Complaint, Ellis alleged the company's issues with cold-chain shipping rendered billions of dollars of drugs worthless.  Am. Compl. ¶ 1-6.  And because CVS executives

---

[10] Ellis criticizes the 2011 re-test's methodology and results, calling it "a questionable study that brought temperatures perilously close to failure thresholds without adequate documentation."  Pl.'s Resp. at 29-30. As discussed below, a reasonable jury could infer these issues as valid, but still insufficient to defeat summary judgment.

[11] *Compare* Def.'s Br. at 21 ("Coldkeepers provided disastrously poor service") *with* Pl.'s Resp. at 36-37 (attributing the end of the deal to CVS's fears of hurting its relationship with its previous supplier of styrofoam packaging, a major corporate buyer of CVS pharmaceutical services).

kept shipping the drugs despite acknowledging a flash-freezing risk, Ellis contends that the company has knowingly committed large-scale fraud against the United States and many of its states, which have paid for the drugs through Medicare and Medicaid reimbursement. *See id.* ¶¶ 88-122.

After the Complaint was unsealed, I dismissed Ellis's claims of false certification, several claims of factual falsity,  and some state and local claims.  *See generally* Mot. to Dismiss Op., ECF 47.  What remains is a "worthless services" theory of factual falsity regarding three specific drugs—temperature-sensitive drugs Enbrel, Humira, and Copaxone.[12]  *See id.* at 9-13.

After a fulsome discovery process, CVS now moves for Summary Judgment.

## II.    Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), and explored by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

The record does not provide the evidence Ellis needs to defeat summary judgment— evidence that could convince a reasonable jury that the drugs were damaged by CVS's decision to risk temporary freezing in shipping.  Ellis certainly points to evidence that there was a risk of freezing in the packages, that CVS knew about that risk, that they considered it a problem, and that they kept shipping sensitive drugs despite knowing about that problem.  But the record shows

---

[12] Enbrel, made by AmGen, and Humira, made by AbbVie, are used to treat rheumatoid arthritis and other conditions.  *See* Ex. 4 (Osial Rpt.) ¶ 10.  Copaxone, made by Teva Pharmaceuticals, is used to treat multiple sclerosis.  *See* Ex. 2, Solomon Rpt. ¶¶ 38-39.

freezing did not necessarily damage any of the drugs' medicinal potency, which is the relevant metric of worthlessness in this case.

Ellis therefore tries to build an alternate theory that finds worthlessness in the mere risk of excursions that *could* make drugs lose their effects. But this theory lacks sufficient support in the law, and requires an unreasonable interpretation of the record.  Without falsity, there can be no false claim, and summary judgment must be granted on both the Federal False Claims Act counts and the state and local analogs.

**A.  Absent evidence of falsity, Summary judgment is warranted  on Counts One, Two, and Three – violations of the federal False Claims Act**

*i. Worthless services claims under the False Claims Act*

The False Claims Act holds liable anyone who  "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).  Courts applying the statute have identified four elements: "that the defendant (1) made a false statement, (2) with scienter, (3) that was material, (4) causing the government to make a payment."  *United States v. Care Alternatives*, 81 F.4th 361, 366 (3d Cir. 2023) (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181-82 (2016)).

The dispute here principally focuses on the first element, falsity.  A claim can either be legally false, where the defendant falsely represents that it complied with a material statute or regulation, *e.g.*, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018). or factually false, where the goods the defendant provided are not what the defendant says they are.  *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011).

Factual falsity includes "worthless services" claims, which "assert[] that the knowing request of federal reimbursement for a procedure with *no medical value* violates the Act irrespective of any certification." *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001) *abrogated on other grounds by* 136 S. Ct. 1989 (2016) (emphasis added). *See also United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

At the Motion to Dismiss stage, I found Ellis adequately pled such a "worthless services" theory by alleging that at least some of the drugs CVS cold-chain shipped were "medically worthless," meaning that they were unable to deliver the "particular therapeutic dose" for which the government had paid. Mot. to Dismiss Op. at 11, ECF 47. Despite extensive discovery, Ellis cannot point to evidence from which a jury could reasonably conclude that the problems encountered in the process of shipping rendered the medications worthless.

### ii. The record does not show any drugs were medically worthless

The critical evidence here consists of the stability studies conducted by the manufacturers of the three drugs. These studies are highly relevant because they allow a comparison between the temperatures that each drug could withstand, and the temperatures Ellis argues they were exposed to during shipping. The studies support the conclusion that all three the drugs could have taken colder temperatures for a longer time than any excursion Ellis claims. Based on the studies, even Ellis's worst-case scenario could not support a jury finding any damage to any drugs. Although Ellis identifies some weaknesses with the stability and packout studies, without affirmative evidence that could support damage to the medication, he cannot meet his burden.

Each drug's studies show meaningful resilience at low temperatures. First, the record shows Humira is [*6 lines redacted*].

Meanwhile, Copaxone's studies found [*8 lines redacted*].

8

Finally, Enbrel is [*6 lines redacted*].

Beyond the studies themselves, CVS points to websites and other public-facing documents hosted by the manufacturer of each drug which calculate whether a given excursion rendered the medication unsafe. Humira's site concludes that a Humira pen is stable exposed to -10 °C for 10 hours. *See* Ex. 36 at 6. A representative of Copaxone's manufacturer, Teva, testified that it relied upon its stability studies when advising distributors whether to use medicines after excursions. *See* Ex. 8, Teva Dep. at 107:16-24. And Amgen maintains a stability calculator for Enbrel, which advises users that Enbrel is safe to use if it experienced an excursion between 2 °C and -20 °C for up to three days. *See* Ex. 31 at 2-3, 6-8; Ex. 28 at 13. Notably, Ellis's pharmacy practice expert testified that he would rely on the Enbrel site's calculations when advising patients. *See* Ex. 14, Wong Dep., at 116:21-117:7. In sum, Ellis' claim finds no support among the manufacturers whose products CVS was shipping.

On the record before me, Ellis has not genuinely disputed that the drugs could take colder temperatures than he claims for longer times than he claims. In fact, Ellis admits that the stability studies for each drug found them resilient to temperature changes. *See* Pl.'s Resp. at 36 ("[T]he results [of Copaxone studies] met Teva's acceptance criteria"); *id.* at 39 (citing three Amgen studies of Enbrel and finding no damage); *id.* at 42 (listing studies of Humira and finding "[t]he results were favorable" for each other than an increase in "particulates" observed in one freeze-thaw study).

As to his specific theory, Ellis does not attempt in his briefing to state how cold the excursions were and how long he believes they lasted. During discovery, seeking to define the contours of the claim, CVS requested by interrogatory that Ellis describe the temperature excursions which allegedly caused flash freezing. In his response, Ellis alleged excursions below

9

0 °C for up to 6 hours, with minimum temperatures of -11.28 °C.  But the manufacturer's data shows [*3 lines redacted*].  And Ellis offers no competing data. That leaves the record devoid of evidence from which a jury could reasonably find that the temperature excursions identified by Ellis rendered any drugs medically worthless.  And if they were not worthless, no jury could find payment for a false claim.

This factual deficit runs headlong into the Third Circuit's decision in *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 440 (3d Cir. 2004), where it held that "[w]ithout proof of an actual claim, there is no issue of material fact to be decided by a jury."

**B. Absent affirmative evidence of falsity, Relator's other efforts to create an issue of fact are legally and factually insufficient.**

Lacking evidence that the drugs were damaged, Ellis casts doubt about the manufacturer studies, argues that damaging excursions may well have occurred, and then advances a novel interpretation of economic worthlessness based on the premise that because the shipments risked compromising the drugs, they should be viewed worthless as unsuitable for sale. The creative advocacy of counsel is admirable, but insufficient to salvage a claim.

*i.    Ellis's expert testimony fails to offer credible evidence that the drugs were damaged*

Ellis offers impressive experts who find deficits in the manufacturer studies and challenge the propriety of CVS's judgment, but that does not suffice as proof the drugs were worthless.

For example, Dr. Adrian Wong, an experienced pharmacist and professor of pharmaceutical practice, offered a detailed breakdown of his view of pharmacists' professional standards and duties as they relate to handling sensitive drugs, concluding that CVS's policies

were inappropriate.[13] *See generally* Exs. 130, 131. Relatedly, Dr. Eduardo Molina, an engineering professor specializing in the design of temperature-control commercial packaging,[14] offers his opinion that CVS's 2009 EPS packouts were inadvisable in design and that the testing CVS used before adopting the EPS packouts was not representative of how the packouts worked in practice. *See* Ex. 133, Molina Resp. Rpt. At 6-7.  These experts' perspectives could lead a reasonable jury to believe the packouts were suboptimally designed and that CVS's decision to use them anyway showed poor judgment.  But that is not the same as establishing that the drugs lost their medical value. These experts at best lend indirect support for the proposition that damage may have occurred. But the conclusion itself remains speculative, and "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment."  *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016).  Flaws in CVS's procedures do not inexorably prove flaws in the drugs.

In a voluminous record, the closest any expert comes to challenging the drugs' integrity is in chemist Dr. Paul Abato's rebuttal report. Dr. Abato argues that the drug stability studies and the packout studies do not accurately reflect what happened to the drugs during transit: first, different speeds of freezing and thawing produce different "cryo-concentration" effects on the drugs' delicate protein structures; specifically, faster freezing and thawing generally tends to damage the structure less because it essentially freezes the proteins' structures in place; slower freezing, meanwhile, may warp the protein by causing it to crystallize, spread out, then freeze, and thereby

---

[13] CVS moved to exclude a portion of Dr. Wong's report on the ground that he makes statements about biologic drugs' structural fragility and temperature excursions' effects without sufficient scientific support. I see no need to reach its *Daubert* motion.

[14] *See generally* Ex. 132, Molina Report at 1-3.

11

lose its shape, and thus its chemical integrity, after it melts.  Ex. 134, Abato Report. ¶¶ 34-36. Although CVS has moved to exclude Dr. Abato's testimony in its entirety, it has not disputed either the general notion that different rates of freezing can have different effects on drugs' chemical structures, or Dr. Abato's qualifications as a pharmaceutical chemist.

But he did not proceed to validate his opinion. Dr. Abato's report hypothesized that, based on his interpretation of the supplier studies, the drugs were likely damaged by the rate of freezing he believes they experienced in the packouts.  *See id.* at ¶ 86.  Yet in his deposition Abato admitted that a given drug could experience any number of different cryo-concentration effects depending on the drug and on the exact process of freezing and thawing the drugs went through; the only way to be confident in the effect experienced by the drugs here would be to conduct a test replicating the conditions he believed they experienced.  *See* Ex. 173, Abato Dep. at 95:4-97:12.  He did not do any such test on the drugs, and he did not review any.  *Id.* at 99:5-100:25 Instead he "extracted" data from his review of the stability studies and the packout studies and reached his own conclusion.  *Id.  Daubert* does not require "specific, actual testing" in every case, *U.S. v. Mitchell*, a requirement that would erect daunting and perhaps insurmountable barriers for securing expert testimony. 365 F.3d 215, 238 (3d Cir. 2004).  But in a case where there is substantial data, most of it from the manufacturers of the drugs at issue, which flatly contradicts an expert's theory, hypothesis alone is not enough to create an issue of fact. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("…when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.")

**C. Ellis's theory of worthlessness is legally unviable and factually unsupported**

Without evidence the drugs were damaged, Ellis offers an alternative theory: because CVS continued shipping the drugs for years despite internal concern about the risk of flash-freezing, CVS "systemically" risked damage to all the drugs, rendering them per se worthless. Pl.'s Resp. at 55, ECF 202. The argument proceeds as follows: because the FDA's label calls for storage and 2 to 8 °C, and the USP warns against temperature excursions away from that range, every relevant drug CVS shipped during the case's time period at least risked violating these guidelines; and because CVS maintained a liberal policy of offering refunds if customers reported a possible excursion, all the drugs shipped via the EPS packouts were presumptively eligible for a free return. From there, Ellis posits that because the drugs were eligible for return, they could not "participate in the legitimate market for reimbursable biologics," and the government was therefore billed for drugs that were technically worthless. *Id.* But the False Claims Act is grounded in the concept of fraud, and I do not view these arguments or the evidence supporting them as sufficiently compelling to relieve Ellis of the burden to prove that any of the drugs were medically worthless.

*1. Theories of "Systemic risk" and "economic worthlessness" do not establish that the Government paid for worthless medications*

First, a supposed systemic risk of freezing does not prove damage to the drugs. Even evidence some drugs were frozen at arrival does not prove those drugs were worthless, both based on the stability studies and because even if frozen on arrival, that single data point does not provide sufficient information to determine for how long it was frozen and whether there was an impact on efficacy. Systemic risk is not systemic damage, and at most Ellis is speculating that such damage could have happened. Such speculation "does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Lexington*

13

*Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005). And in *Quinn*, the Court of Appeals expressed reservations about such an approach: "[Relator's] theory that the claims 'must have been' submitted cannot survive a motion for summary judgment. 382 F.3d at 440.

Likewise, "economic worthlessness" does not imply that a medication lacks therapeutic value, the relevant metric here. This theory, which Ellis advances through economist Dr. Adam Block, focuses on presumed market value, a construct not found in the False Claims Act, or any decision applying it. The legal insufficiency of this theory is borne out by Dr. Block's explanation of the concept in his deposition, in which he testified that "the drugs are economically worthless even if the stability, efficacy, and safety of the medicine were not affected" by the shipping process. ECF 188, Ex. 1 at 101. Necessarily, if the medication had therapeutic value, securing payment for it cannot constitute fraud. It also bears mention that to the extent market viability is proposed as a metric, it is the government payor that defines the market for reimbursement, so it can also define marketability with standards, regulations, or purchasing decisions, none which it did here.

*2. The FDA label and United States Pharmacopeia do not support equating the risk of temperature excursions with worthlessness.*

Ellis' arguments based on the FDA-approved label and USP guidelines merit more detailed discussion, because it is more firmly rooted in case law. The record suggests it is almost impossible to know exactly whether a given set of drugs may have been damaged in any shipping context.[15] Relator's counsel acknowledged this limitation at the hearing on this motion, but argued that

---

[15] *See, e.g.*, Ex. 154, Zimmerly Dep. at 172:9-15 (acknowledging that flash-freezing happened over a matter of "minutes and hours," and it was very difficult to measure an excursion without "some type of temperature probe tracking everything.")

because detection of defective drugs is so difficult, the label and the USP establish a positive duty to eliminate doubts about the drugs' quality, and that CVS was grossly negligent, supporting the conclusion that "worthless packouts equal worthless drugs." Pl.'s Slide Deck at Oral Argument at 8.[16]

There are two problems with this inventive theory. First, assuming that Ellis construes his complaint as pleading such a theory, it did not survive my ruling on the motion to dismiss , which required Ellis to show the drugs were damaged. Second, neither the FDA label nor the USP ultimately supports Ellis's theory of worthlessness. To understand why requires a discussion of how regulatory and industry standards can be relevant to a worthless services claim.

### a. Standards of care in worthless services claims

In a worthless services claim, the goods or services at issue must have so little value that the government is effectively paying for nothing at all. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011). A "diminished value" is not enough, and "[s]ervices that are 'worth less' are not 'worthless.'" *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014).[17]

One way in which courts draw the line of worthlessness is by reference to rules and standards from professional practice and government regulation. Given that "falsity simply asks

---

[16] At the motion to dismiss stage, I left open the possibility that noncompliance with the FDA's label and other relevant rules could indicate an underlying worthlessness. *See* Mot. to Dismiss Op. at 11-13 ("By definition, discarded medication does nothing for a patient regardless of whether the medication had only partially or completely lost its potency. . .[A worthless services claim] rests on the presumption that the government would not willingly pay claims for good[s] and services when they are so *substandard* as to be tantamount to no service at all.") (emphasis added).

[17] As I noted in the Motion to Dismiss memorandum, the Third Circuit has not adopted the worthless services theory in a precedential opinion, but a panel invoked it in a non-precedential opinion. *See In re Genesis Health Ventures, Inc.*, 112 F. App'x. 140, 143 (3d Cir. 2004).

whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government," *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020), sometimes those conditions can be either drawn or inferred from "regulations that are intended to ensure that the services provided to the government have value." *DePaul Health Sys.*, 454 F. Supp. 3d at 494-95.  While reference to such conditions is not necessary for a worthless services claim, *see Mikes,* 274 F.3d at 703, it can clarify what "worthless" means in a given case.

Standards do this in two ways—by signaling what makes a good or service valuable, and by establishing standards of care.  First, standards can help identify the essential aspects of a good or service. This search for signs of worth parallels the FCA's "materiality" element, which requires that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision"—that is, the government would consider the misrepresented feature when deciding to pay or not.  *Escobar*, 579 U.S. at 192.  *See also United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 500 F. Supp. 3d 345, 369 (E.D. Pa. 2020).  Like materiality, worthlessness can be based on an express condition of payment, which is a regulatory or contractual duty, or worthlessness can be based on an "implied condition," which is an essential, but unstated detail of the good or service that a reasonable person would know the government would require before paying.  *See Escobar*, 579 U.S. at 193. Materiality is meant to limit the ways a defendant can be held liable, stopping at the requirements that were express or reasonably clear. "If the Government failed to specify that guns it orders must actually shoot. . . a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out.". *Id.* at 191

16

Courts have found services could be impliedly worthless where medical diagnostic tools do not work based on prevailing standards, making reimbursement claims for those devices worthless because the government paid for those devices to provide diagnoses.  *See United States ex rel. Roop v. Hypoguard*, 559 F.3d 818, 824 (8th Cir. 2009); *Mikes*, 274 F.3d at 703.  Oher times, courts have found a lack of value where state and federal regulations expressly said to do something as part of a reimbursable service, and the provider did not do it, thereby denying the government a key part of the services which it expressly required.  *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 162-167 (E.D. Pa. 2012) (letting claims of worthless service proceed where CVS had agreed in its contract with the state to follow certain federal regulations, including some against selling expired drugs, then had allegedly sold expired drugs).[18]

Finally, just as the materiality of implied conditions is limited by a reasonable person's actual knowledge of the government's actual concern, *see id.* at 194-95, so worthlessness requires "more than mere regulatory noncompliance [. . .] for liability to attach; the noncompliance must be so great that effectively no services were provided." *Jackson.*, 454 F. Supp. 3d at 495.

The difference between implied certification and worthless services is that in the latter, the falsity lies not in any tacit certification of legal compliance, but rather in the factual "deficiency of the services provided to the government." *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 592 (E.D. Va. 2011).[19]  That is, the service or good at issue either works or does not work to

---

[18] Ellis describes *Spay* as supporting a general principle that "when a pharmacy fails to perform a service that is necessary to ensure that a drug should be dispensed, billing the government for that drug is a factually false claim for a worthless service."  Pl.'s Resp. at 53, ECF 202.  But *Spay*'s facts are too complex and nuanced to give rise to such a rule of broad application.

[19] Given the overlap between materiality and falsity in a worthless services claim, evidence for or against materiality—that is, evidence the government did or did not care about a given condition—may be persuasive.

do what the government is paying for it to do. *See United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 965 (D. Minn. 2015) ("From a regulator's standpoint, it is easier to imagine products, like glucose monitors [in *Roop*], *existing along a black-and-white, works-or-does-not scale*. A product might not work properly all the time, and there may be issues with it, but the product must be effectively unusable before FCA liability might arise") (emphasis added). In these black and white situations, reference to standards serves as a definitive benchmark against which to measure whether the service is worthless: diagnostic tests must provide diagnoses, pharmacies must provide drug counseling, and so on.

Where no standard is definitive, and the answer is not a binary one, the issue courts must grapple with is whether the relevant goods or services, when viewed against such standards, are so "deficient" as to be worthless. *Scharber*, 135 F. Supp. 3d at 965. In such cases, the relevant service is "more nuanced and complex and it is more difficult to assess what is worthless service, and what is not." *Id*. Courts do this assessment by finding a relevant, material standard from regulation or industry, treating it as akin to a negligence duty of care, and then equating worthlessness with "gross negligence," defined here as doing nothing or next to nothing, and acting "without even slight care." *Jackson*, 454 F. Supp. 3d at 496.

The gross negligence theory of worthless services has appeared in multiple nursing home neglect cases, where courts must distinguish services that are deplorable from services that are so deplorable they are worthless. *See, e.g.*, *United States v. Am. Health Found. Inc.*, No. CV 22-02344, 2023 WL 2743563, *11-13 (E.D. Pa. Mar. 31, 2023). Notably, courts have found serious neglect did not represent worthless services where the provider showed *some* effort toward following the standard or remedying mistakes. *See, e.g.*, *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) (finding a nursing home's services

18

could not be found worthless where the state allowed the facility to continue operating after inspections and the relator testified her mother received good care there).

In this case, whether the drugs lacked their "particular therapeutic dose" is a black-or-white question more like *Mikes* and *Roop*: either the drugs lost their potency or they did not. Lacking any direct evidence, Ellis advances a gross negligence theory based rooted in the notion that he can meet his burden if the drugs failed to meet FDA and USP standards based upon "CVS's abject failure to ship temperature-sensitive drugs using validated packouts," Tr. of Oral Arg. at 35:8-9. But the relevant standards do not support the broad duties that Ellis claims, and CVS's efforts to address the problem undercut the contention that it was grossly negligent.

### b. Neither the FDA label nor the United States Pharmacopeia can be viewed as prohibiting all temperature excursions

Neither the FDA labels nor USP sections could support a jury finding CVS either violated a material standard or was grossly negligent.

As to FDA labels, CVS expert Dr. David Lin has represented without contradiction that the FDA permits drugmakers to apply for one of a few general temperature labels, specifying that a drug should be stored frozen, stored with refrigeration (2-8 °C, as here), or stored at room temperature. Ex. 6, Lin Report ¶¶ 35-36. The storage temperatures are not tailored to an individual drug unless the manufacturer requests such a label. *Id.* at ¶ 27. These storage requirements do not purport to address the effects of excursions on the medications or to address how the drugs should be transported.

Within this voluminous record, Ellis's only possible evidence that the FDA label requires such strict compliance comes from one of his proffered experts, Dr. Joshua Sharlin. Notably, Ellis does not cite Dr. Sharlin in opposing summary judgment, even though his opinions are confronted

19

by CVS. *see* Def.'s Br. at 13, 26, 30. Sharlin cites various FDA regulations, sometimes from unrelated sections of FDA rules, and declares that "if Humira, Enbrel, or Copaxone is exposed to freezing temperatures while being shipped by CVS to a patient, the drug is deemed no longer safe and effective."  Ex. 76. Sharlin Rept. At 23. [20]  But Sharlin seemingly bases this conclusion on unexplained inferences from regulations which I have already held do not directly apply to CVS in dismissing counts alleging false certification.  I concluded that such regulations dealt with warehousing and storage, but not shipping, and in other instances laid out requirements for states' pharmaceutical licensing laws.  *See generally* Mot. to Dismiss Op. at 6-8, ECF 47.

Yet even treating them as potential implied signals of worth, as described above, the regulations Sharlin cites could not lend themselves to the strict reading Ellis seeks: some merely state what to do when damage to drugs happens, *see, e.g.*, 21 C.F.R. § 205.50(e); others, namely the "Current Good Manufacturing Guidelines," are meant to ensure each drug "meets the quality and purity characteristics that it purports or is represented to possess,"  21 C.F.R. § 210.1(b), which is not in dispute here. And as evidence that a temperature excursion would not be considered to have ruined a medication, Defendants point to an occasion where the United States Department of Veterans Affairs accidentally froze a full fridge of Enbrel at [ *one  numerical value  redacted*] degrees for 48 hours but resumed using it after consulting with Amgen.  *See* Ex. 9, Amgen Dep. at 116:18-22.  This reinforces the defense's argument that temperature excursions would not be viewed as material, because where "the Government pays a particular claim in full despite its actual knowledge that certain requirements were not met," there is "very

---

[20] It bears emphasis that this conclusory quotation comes from the heading of a subsection in the report. The body of that subsection does not provide any basis for such a conclusion by way of  a citation, explanation, or reference to his experience.

strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.  *See Taylor v. Comhar, Inc.*, No. CV 16-1218, 2021 WL 3857799 at *4 (E.D. Pa. Aug. 30, 2021) (McHugh, J.).

This does not mean that FDA labels are a mere suggestion to pharmacies.[21]  Ellis has pointed to ample evidence why pharmacies and pharmacists must view temperature as a serious concern. *See generally* Pl.'s Resp. at 64-67, ECF 202.  But the record here shows that excursions are a known phenomenon which pharmacies attempt to address through different means. In fact, Ellis's own expert witness, Dr. Molina, admitted that "the risk of exposing the product to an outside temperature . . . is inherent to cold chain shipping."  Ex. 13, Molina Dep. at 43:5–7.

Even if the FDA label did set a standard that pharmacies should avoid any risk of excursions, there is not enough evidence to find that CVS was grossly negligent relevant to that standard.  The record shows CVS spent time and money searching for better packouts, including with Ellis' company.  Such efforts undermine any finding of gross negligence.  For example, in *Jackson*, inadequate nursing home care led to residents suffering scabies, bedsores, falls, and maggot-infested wounds, but this did not amount to gross negligence because the nursing home took the residents for treatment for those problems.  *See* 454 F. Supp. 3d at 497.  *See also Taylor v. Comhar*, 2021 WL 3857799 at *3-5 (finding isolated incidents of inadequate staffing and

---

[21] Nor do I agree with CVS that the FDA label, as an informal guidance document issued outside of notice-and-comment rulemaking, can never be considered as part of the factual inquiry into worthless services. *See* Br. at 31-32 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 584) ("An interpretive rule itself never forms the basis for an enforcement action—because. . .such a rule does not impose any legally binding requirements on private parties.") (internal citations omitted).  In a worthless services claim like this one, with no accompanying false certification claim, the "basis" of the action is the FCA itself, not an agency's interpretation, and therefore interpretive documents such as the FDA label may be factually relevant even if they are not legally binding on their own.

sleeping employees could not support a claim of worthlessness against a nursing home).  Although CVS's concerns about excursions persisted for years, the documented number of excursions was small, and the company's efforts to solve the problem they caused shows more than "slight care." *Jackson*, 454 F. Supp. 3d at 496.  Given these efforts, the record here would at most support ordinary negligence.

Similar to the FDA label, no reasonable jury could see the United States Pharmacopeia as either a black-and-white condition or a standard of care which CVS was grossly violated.  The record includes two different editions of USP § 1079, from 2009 and 2013, dealing with drug temperature best practices.  *See generally* Exs. 19, 72. The USP provides direct guidelines, and the record confirms pharmacists treat the USP as their official reference work.  *See, e.g.*, Ex. 147, Klecha Dep. At 37:20-22; Ex. 14, Wong Dep., at 126:11–15.

Section 1079 addresses issues of drug temperature in a variety of settings. The 2009 version includes a section on "Distribution and Shipment of Pharmacopeial Articles." Among what it terms "Temperature Challenges," it addresses shipping. Ex. 72, pp. 537-538. The 2013 version includes a section on "Environmental Management System," which addresses distribution of products and temperature excursions.  *See* Ex. 19.  Neither edition can reasonably be described as setting absolute standards from which a jury could conclude that a mere risk of temperature excursions would render medications worthless.  On the contrary, the USP guide portions in the record assume excursions may happen and gives steps for handling them when a pharmacy detects them.  The USP guide's 2009 edition acknowledges that "Storage temperature ranges may not be indicative of the allowable tolerances during shipping. Articles labeled for special storage conditions (between 2 degrees and 8 degrees) vary widely in their tolerance of short-term exposure to heat and cold." Ex. 72,  32 U.S.P., 27 Nat'l Formulary § 1079 at 538 (2009).  The USP's 2013 edition

22

states that "drug products in the distribution supply chain may be held at temperatures outside their labeled storage requirements as determined by an appropriate stability study."  Ex. 19,  36 U.S.P., 31 Nat'l Formulary § 1079 at 699 (2013).  This statement echoes an earlier subheading on the same page specifically labeled "Excursions:" "Temperature excursions for brief periods outside of respective storage label conditions may be acceptable provided stability data and scientific/technical justification exists[22] demonstrating that product quality is not affected."  *Id.*.  This repeated language undermines the idea that exposing the drugs to the risk of excursions rendered them per se worthless.

Relatedly, a reasonable jury could not find gross negligence because it appears CVS made efforts to follow the USP's guidelines.  In § 1079 of the 2009 USP, a heading on "shipment from pharmacy to patient or customer" lays out what to do "in the events that a patient reports that there has been a deviation from required storage conditions for an article[:]" a pharmacy could either offer a judgment on the drug's suitability, then document the interaction to the manufacturer, or else "promptly replace the suspect article."  Ex. 72, 31 U.S.P., 27 Nat'l Formulary § 1079 at 540

---

[22] Ellis argues that CVS can be found liable because it was shipping medications when it lacked necessary temperature data from manufacturers. The use of the term "exists" in these general provisions about excursions undermines Ellis's position. *See, e.g.*, Pl.'s Resp. at 4-6, 57, 67-68. Ellis bases his argument  on one sentence of the 2013 USP's § 1079, which says manufacturers have a duty to convey stability studies to pharmacies to justify excursions, *see* Ex. 19 at 695, and another statement that "each product excursion must be evaluated to determine the final product effect." *Id.* at 699.  But in context, these two passages could not support finding a duty on pharmacies to measure every possible excursion: the former passage places a duty on manufacturers, not on pharmacies; the guidance to pharmacies appears below, that "all organizations along the supply chain bear responsibility for ensuring. . .parameters that will not affect the drug product identity, strength, quality, purity, or safety." *Id.* at 695.  Meanwhile the language about evaluating each temperature excursion appears in a technical subheading explaining how to calculate drugs' average temperature at various points in the shipping and storage process and appears to apply to specific excursions experienced by particular shipments. *See* Ex. 19, 2013 USP at 699.  Reading these general statements together with the more specific language Ellis quotes, no reasonable jury could read the USP as requiring a pharmacy to have specific prior assurance of any excursion's safety.

(2009).  Considering these two choices, CVS's policy of replacing all drugs that showed up frozen could not be reasonably found to be gross negligence, because in fact it represents one of the compliance options the USP offered.  Nor could CVS be reasonably found to have made next to no effort at following the 2013 USP's broad rule that "all organizations along the supply chain bear responsibility for ensuring. . .parameters that will not affect the drug product identity, strength, quality, purity, or safety."[23]  Its efforts to improve packaging undercut such a contention. Once again, the record would at most support a finding of ordinary negligence.

In sum, the record leaves no doubt that the USP's guidance and the FDA's label are important benchmarks, but it does not show that any deviation from their text makes drugs presumptively worthless.

### B. State and Local False Claims Acts

The remaining counts allege fraud under the false claims act equivalents in states and localities across America.  The parties both acknowledge that the standards in most state and local false claims acts mirror those of the federal FCA.  *See, e.g.*, *United States v. Kindred Healthcare, Inc.*, 517 F. Supp. 3d 367, 389 (E.D. Pa. 2021).  With no dispute about this standard, summary judgment is appropriate on the remaining state and local false claims acts.

### IV.    Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted.  An appropriate order follows.

/s/ Gerald Austin McHugh

United States District Judge

---

[23] Ex. 19, 36 U.S.P., 31 Nat'l Formulary § 1079 at 695 (2013).